**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ernest RODRIGUEZ,
Defendant-Appellant.**

**No. 80–1433.**

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 24, 1981.

▮

Frank Herrera, Jr., San Antonio, Tex., for defendant-appellant.

LeRoy M. Jahn, Daniel E. Maeso, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

\* District Judge of the Eastern District of Louisiana sitting by designation.

Before BROWN and GARZA, Circuit Judges, and CHARLES SCHWARTZ, Jr.,\* District Judge.

GARZA, Circuit Judge:

Appellant, Ernest Rodriguez, was at all times pertinent to this case, a United States Postal Service employee working as a post office window teller in downtown San Antonio, Texas. In May, 1979, appellant became the target of an internal investigation being carried out by postal inspectors. One of these inspectors, Gregorio Castillo, as part of his investigation, rented a post office box at the downtown post office using a fictitious name. Castillo mailed a letter to the post office box with insufficient postage. On May 16, 1979, at the direction of Castillo, a nonpostal service employee, assisting Castillo, Charles Lebrecht, removed the green card from the post office box (which indicated the presence of an insufficient postage letter) and presented the card to appellant-Rodriguez. The amount of postage due was $6.82. Lebrecht gave Rodriguez $6.82 and Rodriguez gave the letter and a receipt for that amount cancelled with a "round dater", the instrument used to cancel stamps with the current date. Again, on July 11, 1979, a similar transaction occurred between Lebrecht and Rodriguez in the amount of $14.11 in which the same procedure was followed except that no cash receipt was given.

On July 25, 1979, Inspector Castillo personally appeared at Rodriguez' window to pick up a similar test parcel. Castillo was known by Rodriguez to be a postal inspector and Castillo's purpose in receiving the test parcel was to determine whether or not Rodriguez was aware of postal regulations which require the teller to deliver to the parcel recipient, upon postage due payment, either cancelled stamps or a cancelled meter strip in the amount of the postage due. Unlike the two prior transactions with Lebrecht, Rodriguez followed the proper pro-

cedure and delivered to Castillo a cancelled meter strip in the amount of $1.26, the amount of postage due.

Subsequently, with the assistance of Lebrecht, the same procedure was followed with test parcel bundles on August 28, September 6, and September 27 in the respective amounts of $109.89, $102.33, and $118.80. As in the prior transactions with Lebrecht, neither cancelled stamps or meter strip were given to Lebrecht.[1] In the evenings after each of these occasions, a postal inspector visited the trash can at Rodriguez' window and removed adding machine tapes. The adding machine was used by Rodriguez to make various calculations throughout the working day. The tapes removed from the trash cans and introduced into evidence showed entries and totals coinciding with the three transactions of August 28, September 6, and September 27.

On October 2, 1979, Inspector Greene appeared at Rodriguez' window, identified himself as a postal inspector and picked up postage due mail. As in the July 25th visit of Inspector Castillo, Rodriguez followed the appropriate rules by giving Greene a cancelled meter strip reflecting the amount of postage due.

On October 5, 1979, Rodriguez was advised by postal inspectors that his account was to be audited. An audit of stamps, envelopes, post cards, cash, and other postal items revealed that Rodriguez' account had a shortage of $534.77.

On November 28, 1979, a grand jury indicted Rodriguez on three counts of willfully converting to his own use monies coming into his hands during the performance and execution of his employment in violation of 18 U.S.C. § 1711. The three counts in the indictment specifically alleged that Rodriguez converted the monies collected from Lebrecht on August 28, September 6, and September 27 and, because each of these amounts exceeded $100.00, each count alleged a felony. Rodriguez was tried by a jury and found guilty on all three counts of the indictment. Rodriguez now appeals and contends that the District Court erred: 1) in admitting evidence concerning Rodriguez' noncompliance with postal regulations prior to and on the dates alleged in the indictment; 2) in admitting evidence concerning Rodriguez' compliance with postal regulations before and after the dates alleged in the indictment, and 3) in denying Rodriguez' motion for acquittal based upon insufficient evidence of the crime charged. Because we find Rodriguez' third point of error dispositive of this appeal we find no reason to discuss the admissibility of the postal regulations in the context of Rodriguez' trial except as they may relate to explaining the sufficiency of the evidence against Rodriguez.

In reviewing the sufficiency of evidence in criminal cases, we are to view the evidence and all inferences that reasonably may be drawn from it in a light most favorable to the government. *Glasser v. U. S.*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Whether evidence is direct or circumstantial, we must accept all credibility choices made that tend to support the jury's verdict. *U. S. v. Allison*, 616 F.2d 779 (5th Cir. 1980). The standard of review is whether a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt. If the jury could not reasonably conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt then we must reverse the conviction. *U. S. v. Kelley*, 630 F.2d 302 (5th Cir. 1980).

The government's theory of Rodriguez' conversions was based upon his failure to disburse either cancelled stamps or meter strips in the amount of the postage due monies he received on the dates alleged in

---

1. The evidence presented during the trial is undisputed that postal clerks commonly forget to follow the proper procedure or customers leave the window before the clerk can perform the procedure. Regarding the dates alleged in the indictment, Rodriguez testified that, although he did not remember the specific transactions with Lebrecht, it was customary for him to either prepare the cancelled meter strip or stamps and, if the customer departed before completion of the procedure, hold them until the next day for the customer to return for them. If the customer did not return, he simply discarded them.

the indictment, thus, enabling him to pocket those monies without his account reflecting a shortage. However, the government also introduced evidence showing that Rodriguez' account was short $534.77 (as reflected by the October 5th audit) in order to prove that Rodriguez may have converted postal monies. Standing alone, either the theory of Rodriguez' conduct or the shortage of Rodriguez' account would be appropriate considerations concerning the possibility of conversion of postal monies. But standing together the theory of conduct and the shortage of account are inconsistent, for if Rodriguez had, as the government contended, refused to disburse cancelled stamps or meter strips in order to conceal his pocketing of those monies, no shortage would have resulted from an audit. It follows, therefore, that any shortage reflected by the October 5th audit would not be probative of conversion of monies by Rodriguez as theorized by the government.

■ Notwithstanding the inconsistency in the government's argument, we have examined the evidence offered to prove Rodriguez' guilt. Although we pretermit discussion concerning the admissibility of evidence concerning violations of postal regulations, even assuming that Rodriguez' failure to follow the proper procedures with postage due mail was admissible and relevant to show intent or absence of mistake, there can be absolutely no question that the failure to comply with the postal regulations can not be used to constitute the criminal offense charged against Rodriguez. *U. S. v. Lester*, 541 F.2d 499 (5th Cir. 1976); *See also U. S. v. Christo*, 614 F.2d 486 (5th Cir. 1980).[2]

■ We must note at the outset, after examining the transcript, there is absolutely no testimony that anyone observed Rodriguez take the amounts alleged and there is no direct evidence linking these amounts

to Rodriguez. The only evidence which potentially corroborates the government's theory is the three adding machine tapes taken from the trash can at Rodriguez' teller window. As previously mentioned, these tapes showed entries and totals coinciding with the transactions involved in the indictment. However, in addition to merely showing entries and totals, the tapes also show, unlike the other entries, an amount, in red, on the left half of the tape exactly corresponding to the postage due amounts given to Rodriguez. The government argues that a permissible inference for the jury to draw from this different type of entry was that Rodriguez made the entry for the purpose of having an indication of how much to pocket from his account at the end of the working day. However, an examination of the tapes reveals that they are only 12 to 18 inches in length and there is no evidence to show whether they constitute the whole day's transactions or whether they merely indicate those transactions immediately before and after the transactions involved in the indictment. There is neither any evidence explaining the presence of several other red entries on the tapes, nor any evidence showing that the three red entries on the left side of the tape were somehow different or unusual for similar transactions conducted by Rodriguez. In short, the adding machine tapes are probative of the fact that Rodriguez took possession of the postage due amounts (an undisputed fact), but without some evidence to indicate the culpable significance of the entries, the tapes are not probative that Rodriguez converted the monies to his own use.

The only other evidence which might be probative of Rodriguez' conversion of the funds was the $534.77 shortage of his account. At first sight, such a discrepancy would seem to be solid evidence of wrongdoing. However, the testimony from the

2. *U. S. v. Christo, supra*, involved a criminal trial for willfull misapplication of bank funds by an officer of the bank. The government was successful in introducing evidence which showed the defendant's actions for which he was being tried criminally had also violated civil regulatory banking statutes. This Court found the evidence to be highly prejudicial and legally irrelevant to proof of the criminal charges and ordered a new trial wherein the criminal charge would "have to stand on its own hind legs unaided by any prejudicial reference to (the civil) violations.." 614 F.2d at 492.

government's own witnesses as well as Rodriguez and others reveals otherwise.

The record reveals that Rodriguez, at all times involved, served as a backup philatelic clerk. Philatelic clerks, in addition to routine clerk services, also carry an extremely large amount of various stamps sold to stamp collectors. Unlike regular window clerks whose account is generally in the neighborhood of $5,000, philatelic clerks generally have a much higher accountability and it is not unusual for their accounts to be as high as $50,000 to $70,000 at any given time. As in the case of a regular postal clerk, Rodriguez handled between two hundred and three hundred customer transactions per day.

Although procedures exist for a daily reconciliation of a clerk's account, a clerk's account is audited by supervisors only three times a year.[3] The evidence is undisputed that accounts rarely balance and that overages and underages in the hundreds of dollars are commonplace. It is also undisputed that these overages and underages occur for various innocent reasons such as borrowing of stamps, money orders, or currency between clerks; errors in transactions with customers; and errors initially made when the postal items are disbursed to the clerks. Inspector Castillo also explained the technique of fast change con-artists who routinely trick clerks out of money which cause shortages in their accounts. The procedures of the post office provide for overages to be placed in a trust account to be credited to that clerk's account in the event of a shortage upon that clerk's next audit or another clerk's in the event it is determined the overage and underage are related. In the event of an underage of a clerk's account, the clerk himself must make up the underage with his own funds unless the amount is within tolerances, related or attributable to a prior overage, or otherwise settled to the satisfaction of the postal service.

At no time during the trial did the government's evidence show that the short-age of Rodriguez' account was caused by criminal activity on his part. Indeed, to this very day, there has been no showing what amount of postal monies, if any, were actually missing from the Postal Service because of any criminal wrongdoing of Rodriguez. In short, the overwhelming and uncontroverted evidence showed that the shortages attributable to Rodriguez' account might have easily have been negligent or even honest mistakes.

Viewing the evidence most favorable to the government, we believe the government has shown Rodriguez to have made mistakes in failing to follow proper postal procedures. For these mistakes Rodriguez will no doubt be held accountable by the Postal Service. However, after having combed through the record, we are convinced that a reasonably minded jury must have had a reasonable doubt as to both Rodriguez' intent and his conversion of the monies alleged to have been taken in the indictment. We are satisfied that the jury could not have reasonably concluded that the evidence presented by the government excluded every reasonable hypothesis but that of guilt. Accordingly, Rodriguez' convictions are REVERSED.

---

**3.** The undisputed evidence shows that the regularly scheduled audit of Rodriguez in August, 1979, revealed an overage of his account in excess of $100.