**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Elzie P. HINDS, M. L. Hinds and Clifton Hardy, etc., Defendants-Appellants.**

No. 80–7992.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Nov. 30, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

William H. Mills, Birmingham, Ala., for Hinds.

James M. Gaines, Huntsville, Ala., for Hardy.

Holly Wiseman, Michael V. Rasmussen, Asst. U. S. Attys., Birmingham, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, TJO-FLAT and THOMAS A. CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

M. L. Hinds, Elzie P. Hinds, his wife, and Clifton Hardy appeal their convictions, following a jury trial, for receiving stolen government property in violation of 18 U.S.C. § 641 (1976). On appeal the Hindses' main contentions are that: (1) the evidence was insufficient to support their convictions; (2) they cannot be convicted under 18 U.S.C. § 641 (1976), which prohibits receiving stolen government property with intent to convert it "for [one's] use or gain," when the evidence showed that the Hindses' corporation derived the "use or gain" from the stolen property; (3) the district court committed plain error in refusing to give an accomplice instruction to the jury. Appellant Hardy challenges only the sufficiency of the evidence that supports his conviction. We affirm.

I.

A. *Clifton Hardy*

Around Thanksgiving, 1979, Robert "Roach" Turberville and Willie "Bubba" Pierce[1] stole approximately 4,000 pounds of new, high quality, copper wire from the Redstone Arsenal outside of Huntsville, Alabama.[2] Turberville and Pierce cut the stolen copper wire into four-foot lengths and sold part of it to appellant Hardy on the night of the theft. Turberville testified that he told Hardy that the copper wire came from "off the Arsenal," and that as far as he remembered Hardy said that he would "get rid of it." Hardy paid the two thieves in cash and gave them no receipt, although he testified it was his usual practice to give receipts for property he bought.[3]

---

1. Turberville and Pierce were "scrap hustlers" who collected scrap from public dumps, construction sites, etc., and sold it to salvage dealers. The record reveals that Turberville and Pierce had long criminal records and were habitual drug users. In fact, both Turberville and Pierce testified that their memories of the events in question here were impaired due to their heavy drug use at the time. Turberville and Pierce have pleaded guilty to charges based on the thefts described herein and are not parties to this appeal.

2. The copper wire belonged to the United States Army Missile Command.

3. Hardy himself introduced into evidence receipts, signed by Turberville, for transactions that occurred about a month after the sales which are the subject of this case. Turberville testified that he had been dealing with Hardy for approximately three years prior to Thanks-

On or about December 6, 1979, Turberville and Pierce returned to the Redstone Arsenal and stole another three thousand pounds of copper wire, again selling a portion of it to Hardy for cash with no receipt given. Altogether, Turberville and Pierce made five or six separate trips to Hardy's place to sell him quantities of the stolen copper wire.[4]

In August, 1980, the FBI interviewed Hardy concerning the copper wire thefts. During that interview Hardy denied knowing Turberville and also denied buying any copper wire from him. When shown a picture of Turberville, Hardy told the FBI agent that he had never seen Turberville before. He did admit, however, that he had bought some copper wire from Pierce.

At trial Hardy testified that he owned a small livestock company and also ran a salvage company in back of his house. He further testified that he had little education and could not write; therefore he handled all of his transactions in cash. Hardy denied that he ever bought any scrap at night and specifically denied buying the stolen copper wire from Turberville and Pierce.

## B. *Mr. and Mrs. Hinds*

Between December 21, 1979, and January 2, 1980, Turberville and Pierce stole approximately 280 aluminum pulleys[5] from the Redstone Arsenal and sold them to Hinds Salvage Company (the Company), of which Mr. Hinds was president and a member of the board of directors.[6] Although there was conflicting testimony, it appears that Hinds was present when Turberville and Pierce brought in the first load of stolen pulleys. After inspecting the pulleys, Hinds negotiated a price with them. Turberville testified that he told Hinds that the pulleys were stolen, and that Hinds replied that he would "get rid of them."

Over a two-week period subsequent to this first transaction, Turberville and Pierce brought several loads of stolen pulleys to Hinds Salvage Company. Usually a Company employee, other than Hinds, would handle the transaction with Turberville and Pierce; in fact, Hinds was not present at the salvage yard on some ·of the days on which Turberville and Pierce delivered pulleys.

Each time that Turberville and Pierce delivered a load of the stolen pulleys to Hinds Salvage Company they were paid by Mrs. Hinds, who was the bookkeeper and cashier for the Company. She paid them by check, but instead of making the checks payable to Turberville and Pierce she made them out to false names such as "Jimmy Jones" and "Jimmy Harris." Turberville testified that when the goods he sold to the Company were not stolen, Mrs. Hinds would use his real name on the checks, but when the goods involved were stolen she would ask Turberville what name he wanted to appear on the check. Additionally, two tellers from the Hindses' bank testified that in December, 1979, two men fitting the description of Turberville and Pierce attempted on several occasions to cash checks made payable to "Jimmy Jones" and "Jimmy Harris." Since the checks were written on the Hinds Salvage Company's account and since the two men had no identification, the tellers called Mrs. Hinds to secure her approval to cash the checks; she always gave her consent. Finally, the government introduced into evidence several checks, all signed by Mrs. Hinds, some of which were made payable to Turberville and some, dated December, 1979, payable to "Jimmy Jones" and "Jimmy Harris."

When first interviewed by the FBI on January 3, 1980, Mr. Hinds denied knowing how the stolen pulleys got on his property and said that he did not even know the

---

giving, 1979, and that Hardy never gave receipts when the goods involved were "hot."

4. Count Three of the indictment, upon which Hardy was convicted, alleges that in all Hardy received approximately 5,700 pounds of the stolen copper wire.

5. The pulleys belonged to the Tennessee Valley Authority.

6. Other board members included Mrs. Hinds and two other persons not involved in this case.

pulleys were at his yard until the FBI inquiry.[7] However, in an interview with the FBI six days later, Hinds identified Turberville and Pierce as the two men who brought the pulleys into his yard, but he continued to deny that he ever personally handled any of the transactions with them. Hinds did tell the FBI that he had known Turberville for four or five years and that he knew that Turberville had stolen property previously. The FBI agent also testified that Hinds told him that "there were X number of other junk dealers in town that would buy [stolen property] so, [Hinds] indicated he might as well buy it."

At trial, Hinds testified that he acted as a general supervisor at Hinds Salvage Company and spent little time directly purchasing scrap. He also testified that he did not buy any stolen pulleys from Turberville and Pierce and had never knowingly bought stolen merchandise. His testimony was corroborated by several relatives and employees of the Company.

Mrs. Hinds testified that she was merely the bookkeeper at the Company and was never directly involved in the purchase of any scrap. She further denied knowing Pierce and knowingly using false names on the checks paid to Turberville and Pierce; she just made the checks payable to the name the seller gave her.

## II.

■ All three appellants challenge the sufficiency of the evidence that supported their convictions. In reviewing the sufficiency of the evidence in criminal cases, we are to view the evidence and all inferences that may reasonably be drawn from it in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Whether evidence is direct or circumstantial, we must accept all credibility choices that tend to support the jury's verdict. *United States v. Allison*, 616 F.2d 779 (5th Cir.) *cert. denied* 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d

72 (1980). The standard of review is whether a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant's guilt. If the jury could not reasonably have concluded that the evidence excluded every reasonable hypothesis but that of guilt, then we must reverse the convictions. *United States v. Rodriguez*, 654 F.2d 315 (5th Cir. 1981); *United States v. Kelley*, 630 F.2d 302 (5th Cir. 1980). Guided by these standards we will review separately the evidence pertaining to each appellant.

### A. *Hardy*

Hardy does not challenge the sufficiency of the evidence that he received the stolen copper wire from Turberville and Pierce; rather he asserts that it was not established that he received the stolen property "knowing it to have been ... stolen ..." 18 U.S.C. § 641 (1976). Viewed in the light most favorable to the government, the evidence showed that several times Hardy purchased stolen copper wire from Turberville and Pierce, paid them in cash, and gave no receipts, although it was his usual practice to do so. Some of Hardy's dealings with Turberville and Pierce occurred at night. Further, Turberville told Hardy that the copper wire came from "off the Arsenal" and Hardy told Turberville he would "get rid of it." Finally, Hardy, in his initial interview with the FBI, denied knowing Turberville; there was evidence, however, that Hardy had in fact been dealing with Turberville for two or three years prior to the sales in question here.

■ Hardy first asserts that this evidence is insufficient to convict him because there are plausible, innocent explanations for each "incriminating" fact in evidence against him. Even assuming this to be true, it is of no moment, for the jury is entitled to draw any reasonable inference from a fact presented into evidence; on these facts the jury could reasonably have inferred that Hardy knew the copper wire

---

7. There was evidence, however, that later on January 3, after the FBI agent had left, Turberville and Pierce delivered another load of pulleys to Hinds Salvage Company and that Mr. Hinds failed to notify the FBI of this development as he had promised to do.

to be stolen when he purchased it. Moreover, breaking the evidence down into discrete "facts," each with its own innocent explanation, distorts the jury's actual view of the case. For even if the jury had found that each piece of evidence, standing alone, was consistent with innocence, the jury nevertheless could reasonably have concluded that the evidence, taken as a whole, excluded every reasonable hypothesis but that of guilt. *United States v. Rodriguez,* 654 F.2d at 317. Finally, we must view the evidence in the light most favorable to the government and under this standard Hardy's "innocent explanation" argument obviously must fail.

Hardy also contends that the evidence against him is insufficient since it is largely based on the testimony of Turberville and Pierce,[8] two admitted thieves, both of whom had long criminal records and histories of drug abuse, and admitted that their memories of their sales of goods to Hardy were impaired by their drug use. This contention is without merit since the jury was entitled to judge Turberville's and Pierce's credibility just as it judged the credibility of any other witness. We also note that Turberville and Pierce gave substantially similar testimony of their dealings with Hardy, adding credibility to their respective accounts.[9] Finally, as noted earlier, in reviewing the sufficiency of the evidence "we must accept all credibility choices made that tend to support the jury's verdict." *Id.*

■ Hardy also seems to suggest that because his conviction is based primarily on circumstantial evidence we should scrutinize the sufficiency of the evidence more closely. However, "[t]he test for evaluating

the sufficiency of the evidence is the same whether the evidence is direct or circumstantial." *United States v. Womack,* 654 F.2d 1034, 1042 (5th Cir. 1981); *United States v. Dwoskin,* 644 F.2d 418, 420 (5th Cir. 1981). Thus, we must conclude that there was sufficient evidence upon which the jury could convict Hardy of knowingly receiving stolen government property.

## B. *Mr. Hinds*

■ At the outset we reject Mr. Hinds' contention that the testimony of Turberville and Pierce was so unreliable and inconsistent that his conviction based on their testimony cannot be upheld. We first note that Turberville's and Pierce's accounts were corroborated by other documentary and testimonial evidence.[10] More importantly, we reiterate that the jury was entitled to give those accounts whatever weight it felt was deserved. See Part II A, *supra.*

■ Hinds' argument that there was insufficient proof that he knowingly received the stolen pulleys must also fail. Briefly, the evidence, viewed in the light most favorable to the government, demonstrated that Hinds was present on or about December 24, 1979, when Turberville and Pierce brought in the first load of pulleys.[11] While negotiating a price with them, Hinds was informed that the pulleys were stolen; he promised to "get rid of them." In his initial interview with the FBI, Hinds denied knowledge of the pulleys; in a later interview, however, he identified Turberville and Pierce as the sellers of the pulleys and also indicated that he bought stolen property because other junk dealers in the area were doing so. This evidence was sufficient to

---

**8.** There was, however, additional evidence against Hardy, including the testimony of the FBI agent who interviewed him and the receipts given to Turberville by Hardy for transactions involving non-stolen goods.

**9.** It is true that Turberville and Pierce did not agree on the specific dates of the thefts and sales involved herein; nevertheless their accounts were otherwise materially the same.

**10.** This evidence included the testimony of the FBI agent and the checks and receipts ex-

changed between Hinds Salvage Company and Turberville and Pierce.

**11.** Although there was testimony that Mr. Hinds was not present at the salvage yard on December 24, 1979, there was also evidence that Mr. Hinds was present on the day of the first sale and that the date of that sale was December 24. The jury was free to disbelieve Mr. Hinds' alibi and to find that he was present at the salvage yard on December 24 and personally bought the first load of stolen pulleys from Turberville and Pierce.

support the jury's finding that Hinds knowingly received the stolen pulleys.[12]

Hinds next contends that there was no evidence in the record that the value of the stolen goods he received exceeded the statutory amount required for conviction of a felony.[13] Specifically, he asserts that the evidence showed him to be present at only the first purchase of pulleys from Turberville and Pierce and that there was no proof that the value of pulleys bought at that time exceeded the required one hundred dollars. Further, Hinds argues that even if he is implicated in all of the deliveries of stolen pulleys, each receipt of stolen goods constituted a separate offense and may not be aggregated to satisfy the statutory amount.

██ There was evidence in the record, however, that the first sale of the stolen pulleys to Hinds Salvage Company, at which Hinds was present, occurred on December 24, 1979. Also in evidence are two checks, dated December 24, 1979, made payable to "Jimmy Jones" and "Jimmy Harris," Turberville's and Pierce's phony monikers. These checks and their accompanying receipts indicate that Hinds paid well over one hundred dollars for the pulleys; thus there was sufficient evidence that the stolen goods he received were valued over the requisite statutory amount. Deciding this point as we do, we need not reach Hinds' other contentions concerning this issue.

### C. Mrs. Hinds

Mrs. Hinds contends that the government did not sufficiently prove that she knew that the pulleys she bought from Turberville and Pierce were stolen. She argues that the evidence showed that she was merely the bookkeeper at Hinds Salvage Company performing the ministerial function of writing checks and that mere presence at the scene of a crime does not prove guilt.

██ We must disagree with Mrs. Hinds' assessment of the evidence. The record reflects that on several occasions Mrs. Hinds paid Turberville and Pierce for loads of stolen pulleys by making the checks payable to false names and by personally authorizing the checks' payments when the bank questioned the identities of the payees. Further, the evidence showed that Mrs. Hinds knew the true identity of Turberville and that she would only use phony names on the checks when the goods being purchased were stolen. From this we conclude that the evidence of Mrs. Hinds' "guilty knowledge" was sufficient to support her conviction. We also reject, for reasons already stated, her arguments on the unreliability of Turberville's and Pierce's testimony and on the government's failure to prove the value of the stolen property.

### III.

The Hindses assert that they cannot be convicted under 18 U.S.C. § 641 (1976), which prohibits receiving stolen government property "with intent to convert it to [one's] use or gain," when the evidence showed that Hinds Salvage Company, a corporate entity, in fact derived the "use or gain" from the stolen property. They also contend that the district court erred in instructing the jury that it could convict the Hindses upon a showing that they received stolen goods "for their own use and benefit, *or for the use and benefit of their company*" (R. 849) (Emphasis added). In the same vein, the Hindses argue that the district court's refusal to give a requested

---

**12.** Other evidence pertaining directly to Mrs. Hinds' guilt, such as the checks written to Turberville's and Pierce's phony aliases, also tends to implicate Mr. Hinds.

**13.** 18 U.S.C. § 641 (1976) provides that whoever knowingly receives stolen government property "[s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both; *but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both* (Emphasis added). The statute defines "value" as "face, par, or market value, or cost price, either wholesale or retail, whichever is greater." Thus, for a defendant to be convicted of a felony under this statute, the value of the stolen property he receives must exceed one hundred dollars.

instruction to the effect that the "use or gain" from the stolen goods must run directly to the defendant was error.[14]

It is true that the stolen pulleys received from Turberville and Pierce went onto the Hinds Salvage Company's regular scrap pile and thus became indistinguishable from all other scrap owned by the Company. This circumstance, however, is of no benefit to the Hindses, for the mere fact that the value of the stolen property goes to Hinds Salvage Company, as a corporation, does not mean that the Hindses cannot be said to have received it "with intent to convert it to [their] use or gain." The record shows that the Company was a closely held "family" corporation which had been operated by the Hindses since 1960. Mr. Hinds was president of the Company, while Mrs. Hinds was vice-president; each drew a salary from the Company. The Hindses were on the Company's four-member board of directors and together they owned fifty percent of its stock. Clearly, the Hindses had a significant financial interest in the Company; thus the jury was authorized to conclude that they had the requisite intent to convert the stolen pulleys for their own gain; i. e., when the Company benefitted the Hindses benefitted.[15]

Moreover, we find that the district court's instruction on intent [16] was adequate. While there may be a set of facts under which the instruction could be considered too broadly stated, we believe that on the facts of this case, the district judge's charge satisfactorily reflected the law. As previously stated, the evidence showed that the Hindses personally benefitted when Hinds Salvage Company did; thus the court's instruction that one element of the crime charged [17] was satisfied by proof that the Hindses received stolen property with intent to convert it "for their use and benefit, or for the use and benefit of their company," was merely a permissible clarification of the law, tailored to the facts of this case. Finally, the judge's refusal to instruct the jury that if the use or benefit of the stolen goods went to the Hindses' corporation, instead of directly to the Hindses, the Hindses could not be convicted, was not error. *See e. g. United States v. Kerley*, 643 F.2d 299, 303 (5th Cir. 1981) (refusal of trial judge to give requested instruction must be considered in light of jury charge as a whole, evidence presented, and arguments of counsel).

Because of our resolution of this issue we do not reach the government's contention that 18 U.S.C. § 641 (1976) extends to the receipt of stolen property for the benefit of third parties.

14. The record does not contain the precise instruction the defendants requested.

15. Of course, proof that the Hindses *actually benefitted* from the stolen property is not required to show that they *intended* to convert the property for their own use or gain. Additionally, the record clearly demonstrated the Hindses' substantial financial interest in Hinds Salvage Company. Thus, no economic, accounting, or other evidence of that interest was necessary; we intimate no view concerning the necessity of such evidence in a different case.

16. The relevant portions of the district court's charge are as follows:
 When I say received or purchased, I mean that it was either purchased for their own use, or for the use of some company or group with which they were associated, with the intent ultimately to use it for their own benefit or for the benefit of the company with which they were associated....
 \* \* \* \* \* \*

So, the second point then that the Government must prove beyond a reasonable doubt is that the property that had been stolen ... was purchased or received for their own use and benefit, or for the use and benefit of their company by the defendants named in the particular case....
 \* \* \* \* \* \*
To briefly summarize then, proof [is required that the stolen property] was received or purchased for [the defendants'] own use or the use of their company by the defendant[s] involved in the particular charge.... (R. 849, 851–52).

17. The other two elements of the offense, according to the court's instructions, were proof that United States property, valued at over one hundred dollars, was stolen and that the receiver knew at the time of receipt that the property was stolen.

**370**

### IV.

The Hindses assign as error the district court's failure to instruct the jury on the unreliability of accomplice testimony. They argue that Turberville and Pierce were their accomplices in receiving the stolen goods. Since this is so, they assert, and since Turberville's and Pierce's long criminal and drug abuse histories made them unreliable witnesses, the trial court should have given an accomplice instruction.[18]

 The Hindses concede that because they failed to raise this point in the district court our review is conducted under the "plain error" standard. *Fed.R.Crim.P.* 52(b); *See e. g., United States v. Nabrit,* 554 F.2d 247, 248 (5th Cir. 1977). Under this standard, reversal for failure to give a desired jury instruction is required only if the error is " 'so obvious that failure to notice it would "seriously affect the fairness, integrity, or public reputation of judicial proceedings," ' . . . and result in a 'miscarriage of justice'. . . ." *United States v. Berrojo,* 628 F.2d 368, 370 (5th Cir. 1980) (citations omitted).

 Assuming, *arguendo,* that Turberville and Pierce were accomplices,[19] the Hindses' argument nevertheless misses the mark. The policy behind the giving of an accomplice instruction is "no more than a commonsense recognition that an accomplice may have a special interest in testifying, thus casting doubt upon his veracity." *Cool v. United States,* 409 U.S. 100, 103, 93 S.Ct. 354, 357, 34 L.Ed.2d 335 (1972). The accomplice is thought to have a "motive to lie"[20] since he is in a position to extricate himself by incriminating his partner in crime. Moreover, the possibility of leniency in plea agreements and sentencing renders an accomplice's testimony one to be considered with great care and caution.

None of these considerations are relevant, however, in the present case. The record reflects that, prior to testifying, both Turberville and Pierce had pleaded guilty to charges based on their thefts from Redstone Arsenal. In addition, both had been sentenced and were serving prison terms at the time of the Hindses' trial.[21] There is no indication in the record that Turberville and Pierce had anything to gain by testifying against the Hindses.[22] Thus, the reason for

---

**18.** A typical accomplice instruction reads:

> An accomplice is one who unites with another person in the commission of a crime, voluntarily and with common intent. An accomplice does not become incompetent as a witness because of participation in the crime charged. On the contrary, the testimony of one who asserts by his testimony that he is an accomplice, may be received and considered by the jury, even though not corroborated by other evidence, and given such weight as the jury feels it should have. The jury, however, should keep in mind that such testimony is always to be received with caution and considered with great care.
>
> (You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that unsupported testimony beyond a reasonable doubt.)

Devitt and Blackmar, *Federal Jury Practice and Instructions,* § 17.06 (3rd ed. 1977); See also, *Fifth Circuit Pattern Jury Instructions (Criminal Cases),* Basic Instruction 2B (West 1979).

**19.** An assumption whose truth we question. *Cf. United States v. Santos,* 483 F.2d 35 (5th Cir. 1973) *cert. denied* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1974) (no accomplice instruction necessary unless some witness can be considered accomplice). *See also, United*

States v. Simmons, 503 F.2d 831 (5th Cir. 1974); *United States v. Nolte,* 440 F.2d 1124 (5th Cir.) *cert. denied* 404 U.S. 862, 92 S.Ct. 49, 30 L.Ed.2d 106 (1971); *Phelps v. United States,* 252 F.2d 49 (5th Cir. 1958).

**20.** *United States v. Morrone,* 502 F.Supp. 983, 992–93 (E.D.Pa.1980).

**21.** The record does not indicate the exact charges to which Turberville and Pierce pleaded guilty or the sentences they received. Turberville did testify, however, that he had received a four-year sentence.

**22.** In fact the Hindses' brief is conspiciously silent as to the motivations of Turberville and Pierce, as alleged accomplices of the Hindses, to fabricate testimony damaging to them. Instead, the Hindses argue that an accomplice instruction was required because of the inherent unreliability of Turberville and Pierce, admitted felons and drug abusers. Appellants Hindses' Brief at 34–36. But as we have already stated, see Part II A, *supra,* these facts concerning Turberville and Pierce go toward their credibility, and the judge's instructions to the jury on credibility sufficiently protected the Hindses' rights.

charging the accomplice instruction was missing, and there was no plain error in failing to give it.

The Hindses cite *Tillery v. United States*, 411 F.2d 644 (5th Cir. 1969), to support their position on the accomplice instruction issue. However, *Tillery* merely stands for the proposition that uncorroborated accomplice testimony may support a conviction unless the testimony is "incredible or insubstantial on its face," *id.* at 647, *see also United States v. Moreno*, 649 F.2d 309, 312 (5th Cir. 1981); it does not compel us to find error in the present case. First, the respective accounts of Turberville and Pierce were corroborated by the testimony of each other, *United States v. Windom*, 510 F.2d 989, 994 (5th Cir.) *cert. denied*, 423 U.S. 863, 96 S.Ct. 121, 46 L.Ed.2d 91 (1975), by the testimony of the FBI agent, *Govt. of the Canal Zone v. O'Calagan*, 580 F.2d 161, 163 (5th Cir.) *cert. denied*, 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978), and by other testimonial and documentary evidence. *United States v. Nabrit*, 554 F.2d at 249. Second, Turberville's and Pierce's testimony, while at times confused, was not "incredible or insubstantial on its face." *Tillery v. United States*, 411 F.2d at 647. *See e. g., United States v. De Los Santos*, 625 F.2d 62, 65 (5th Cir. 1980); *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir. 1976). We thus conclude that the district court did not commit plain error in failing to give an accomplice instruction.

We have carefully examined the Hindses' other points on appeal and find them to be without merit.

AFFIRMED.

---

Moreover, the record does not show any attempt by Turberville and Pierce to extricate themselves by casting blame upon the Hindses; in fact they readily admitted their involvements in all sorts of illegal activities.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.