**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Felix BOLLA (Rufin), Luis Ataya Bolla (Rufin) and Jorge Bolla,
Defendants-Appellants.**

**No. 81–3536
Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Aug. 27, 1982.

LeRoy A. Hartley, New Orleans, La., for Jorge Bolla and Felix Bolla.

Jerrell A. Breslin, Miami Fla., for Luis Ataya Bolla.

McDonough & McDonough, Birch P. McDonough, Court-appointed, New Orleans, La., for Henry Dwilio Tomlinson.

John P. Volz, U. S. Atty., John Patrick Deveney, Harry W. McSherry, Jr., Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before GEE, RANDALL and TATE, Circuit Judges.

PER CURIAM:

During 1979 and 1980, various federal and state narcotics officers from Georgia to Texas participated in a massive undercover operation entitled "Operation Grouper." They posed as members of a marihuana offloading business that would provide landing spots for smuggling ships, labor to unload the marihuana, trucks for transporting the marihuana to a storage site, and the storage site itself. The case began when three other conspirators (who are not appellants) met with an undercover agent in Kenner, Louisiana, and stated that they had shiploads of marihuana coming from Colombia and needed services.

At the first meeting, the agents showed the smugglers a local dock near Dulac, Louisiana, and discussed supplying a vessel to meet the defendants' boats from Colombia. The agents were guaranteed $35 per pound to be paid from the proceeds. Appellant Luis Bolla met with the agents on March 23, 1980, and was shown the dock and storage site, confirmed the earlier discussions, and paid the agents a $15,000 advance fee. Luis Bolla appeared to be the "main man" in the organization. The agents agreed to store the marihuana long enough for appellants to assemble their buyers, modify the storage site to appellants' specifications, establish coordinates to meet appellants' boat, and coordinate other facts, such as radios and hotel accommodations.

On April 16, 1980, all appellants assembled near the New Orleans area for the operation. Appellants George Bolla and Felix Bolla were picked up at a Ramada Inn and driven to the storage site. On April 17, 1980, the Colombian ship was met offshore by its escort vessel with appellants and the agents aboard. Luis Bolla went ashore from the escort vessel. George, Luis, and Felix Bolla helped to unload the marihuana from the ship, and at the storage site George and Felix Bolla supervised the weighing of the marihuana.

The next day the remaining defendants obtained a buyer and agreed on a deal regarding about 6,000 pounds of marihuana. The agents had originally planned to seize all the marihuana at once; however, this new buyer caused the agents to change their plans. At this point, the agents were aware that the buyers were coming to take delivery of the 6,000 pounds. Fearing that some of the marihuana might reach the market, the agents put out a bulletin on the police radio frequencies that a child had been lost in the area. Appellants monitored police radio frequencies, and when they heard of the increase in local patrol cars approaching, they panicked and fled. Ap-

**932**

pellants were subsequently convicted of conspiracy to import and importation of marihuana; conspiracy to possess with intent to distribute and possession with intent to distribute marihuana; and interstate transportation to facilitate the carrying on of unlawful activity, the possession, importation, and distribution of marihuana, in violation of 21 U.S.C. §§ 841(a)(1), 846, 952(a), 963, 960(a)(1); and 18 U.S.C. §§ 2, 1952.

*Admission of Statements by Coconspirators*

■ Appellants George and Felix Bolla contend that it was error to allow into evidence the hearsay statements of coconspirators because the government allegedly failed to lay a proper predicate for their admission. Rule 801(d)(2)(E), Fed.R.Evid., provides that statements made by a coconspirator of a party during the course and in the furtherance of a conspiracy are not hearsay. In order for a coconspirator's statement to be admissible, the trial court must determine, based on substantial and independent evidence, that a conspiracy existed, that the declarant and a defendant were members of the conspiracy, and that the statement was made during the course and in furtherance of the conspiracy. *United States v. James,* 590 F.2d 575, 578–81 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

■ The purpose of a *James* hearing is to establish the existence or nonexistence of the predicates for admission of a coconspirator's extrajudicial declaration before the declaration is made to the jury. *United States v. Grassi,* 616 F.2d 1295, 1300 (5th Cir. 1980), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1981). To be admissible, the extrajudicial statement must have been made by one who conspired with the party against whom the statement was offered, and it must have been made during the course of the conspiracy and in furtherance thereof. *Id.* Under the *James* rule a trial judge has the exclusive responsibility for making the requisite findings necessary to determine the admission of the extrajudicial statements of a coconspirator. *Id.*

■ To protect a defendant from admission of prejudicial hearsay on the basis of threadbare evidence of conspiracy, the judge must decide at the conclusion of the *James* hearing whether the independent evidence linking the defendant to the conspiracy is substantial. *Id.* If a coconspirator's extrajudicial declaration is admitted into evidence, the judge must reconsider its admissibility at the conclusion of trial. *Id.* In making its determination at the conclusion of trial, the governing standard is higher than that applied in the *James* hearing, *i.e.,* whether the prosecution, through independent evidence, has demonstrated the defendant's participation in the conspiracy by a preponderance of the evidence. *Id.*

At the *James* hearing, the government introduced testimony of agents Donald, Hazelwood, and Harrison. Agent Donald testified about statements of a Fidel Lorenzo in February 1980, representing himself to be part of a smuggling venture and agreeing to use the offload and farm storage sites. Also, on April 16, 1980, Lorenzo and a Bobby Chirino indicated that they expected the arrival of a ship that night and indicated the number of persons who were expected.

They also requested a pilot to fly out over the gulf to search for the ship and spoke of a $2,600 payment for storage site repairs. Bobby Chirino made contact with the ship by a sideband radio and indicated that it was coming in the next day. Agent Hazelwood had a discussion with Luis Bolla relative to the buyers and was advised that it was Bolla's load and that he would sell to whomever he wished. There was a meeting at the farm relative to the inspection of the marihuana, its price, and how it was to be transported.

Agent Harrison met with George and Felix Bolla at the Ramada Inn, transported them to Dulac and then back to the motel, where they met Lorenzo, Bobby Chirino, and Agent Russell. Lorenzo told Harrison to make a call to one Spiro, who was one of the buyers, and have him call Lorenzo back right away at the motel.

Harrison met a Gus Barres at a Howard Johnson Motel and was advised by him that there were two persons staying there. One was a prospective buyer, (Larry) and the other was to be shown the offloading sites for future deals. While en route to the plantation site, Larry told Harrison that he did not wish to be brought to the site but that one bale of marihuana was to be brought to him at a designated location for his inspection and approval as to its quality. Later that day, Harrison had a conversation with Bobby Chirino, Lorenzo, and Agent Weed. The conversation consisted of a discussion of who was to blame for bringing some people from the airport as prospective buyers for the marihuana. Hazelwood was getting blamed for it, but Weed stated that it was Luis Bolla's fault because Luis had met the people at the airport and brought them back to the area.

On April 18, 1980, Harrison was instructed by Lorenzo to bring Luis and Felix Bolla to the New Orleans airport for an 11:50 flight to Miami. Harrison stated that Lorenzo told him that Luis Bolla had to get back to Miami to contact the Colombian connection to advise them that they were displeased with both the quality and quantity of the marihuana. From the foregoing, it is clear that the requirements of *James* were easily met by the evidence adduced at the hearing and that the court's decision as to the admission of coconspirators' statements was proper.

The finding by the district court that a conspiracy existed, thus allowing the admission of the coconspirators' statements, is subject to the clearly erroneous standard of review. *United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. 1981). This court will not overturn a district judge's admission of statements under the coconspirator exception to the hearsay rule, based upon his consideration of the merits of each side, unless it was clearly erroneous. *United States v. Dean*, 666 F.2d 174, 179 (5th Cir. 1982). The trial court made the appropriate findings before trial and after the government rested in compliance with *James*. The court's determination that a conspiracy existed and the resulting admission of coconspirators' statements are not clearly erroneous and will not be disturbed.

*Sufficiency of the Evidence*

Appellants George and Felix Bolla contend that there was insufficient evidence upon which to convict them on all counts. In reviewing the sufficiency of the evidence in criminal cases, this court is required to view the evidence and all inferences that may reasonably be drawn from it in the light most favorable to the government. *United States v. Lopez*, 663 F.2d 532, 533 (5th Cir. 1981); *United States v. Hinds*, 662 F.2d 362, 366 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1720, 72 L.Ed.2d 140 (1982). We must accept all reasonable inferences and credibility choices that tend to support the jury's verdict. *Id.* The standard applied is whether a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant's guilt. If the jury could not reasonably have concluded that the evidence excluded every reasonable hypothesis but guilt, then the conviction must be reversed. *Id.* The test is the same whether the evidence is direct or circumstantial. *Id.* 662 F.2d at 367.

The facts at trial showed that the appellants first contacted the agents seeking assistance in offloading the marihuana coming in from Colombia. The appellants paid the agents advance money that was used by the agents, at the appellants' directions, to prepare the offload site. The marihuana, the mother ship, and its escort boat were all the property of appellants. Finally, appellants controlled the whole operation, locating buyers, negotiating prices, and arranging for the sale and transportation of the marihuana.

Felix, George, and Luis Bolla actively helped to unload the marihuana, and the latter two supervised the weighing of the marihuana at the storage site. Felix Bolla rode with the lead truck from the offload site to the storage area to protect his and his brothers' interests. Luis Bolla had come ashore from the escort vessel and

**934**

helped sort through the marihuana bales to determine the quality. Later, Luis and George Bolla discussed prices with the buyers, and George took them a bale as a sample. There was clearly sufficient evidence upon which the jury could base a conviction, and appellants' argument in this respect is without merit.

*Outrageous Government Conduct as a Defense*

 Finally, appellant Luis Bolla advances two points for reversal grounded in the supposed defense of outrageous government conduct. Assuming that the possibility of such a defense—distinct from that of entrapment—survives *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), as it probably does, the facts presented here are not such as to raise it. The evidence of Luis Bolla's predisposition to the crime is conclusive, doubtless prompting his resort to this expedient rather than to the established defense theory of entrapment.[1] All that the government did was provide a web for him to fly into, along with "his load." Such measures are miles from whatever may some day be recognized as conduct sufficiently outrageous as to constitute a defense on due process grounds. The example of such conduct usually cited by the Supreme Court in hypothesizing such a defense [2] is one involving the extraction of evidence from a handcuffed subject's stomach by means of emetics. *See Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (cited in *United States v. Hampton*, 425 U.S. at 491, 96 S.Ct. at 1650 (Powell, J., concurring), and *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). Nothing remotely in any such category of governmental action is even claimed here, much less shown; and the defense—if one exists—was not raised by the evidence.

AFFIRMED.

---

1. Which now refers to predisposition alone, it appears, "entrapment" having become a term of art. *See Hampton v. United States*, 425 U.S. at 492 n. 2, 96 S.Ct. at 1651 n. 2 (Powell, J., joined by Blackmun, J., concurring with the plurality on this point).

2. So far as is known to us, no one has yet successfully *maintained* such a defense in the general area of defenses grounded in government inducement to, or involvement in, crimes.