**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert ATKINS, Defendant-Appellant.**

**No. 79–5211.**

United States Court of Appeals, Fifth Circuit.

June 5, 1980.

---

Robert Dane Smith, Thomas G. Murray, Miami, Fla., for defendant-appellant.

Ronald G. Woods, John M. Potter, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

Before JONES, GEE and REAVLEY, Circuit Judges.

GEE, Circuit Judge:

The central issue in this rather close case is whether the record evidence, viewed as it must be on this appeal in the light most favorable to the guilty verdict,[1] is sufficient to sustain that verdict. Our inquiry, of course, is not whether we—sitting as a jury—would conclude that defendant Robert Atkins is guilty beyond a reasonable doubt but whether in our judgment a reasonable-minded jury could do so.

The critical evidence in the case focuses on Atkins' relationship with one Andy Inglet, a resident of Houston and a member of a cocaine conspiracy.[2] It is not disputed here that Inglet was in the cocaine "business" and that one of his associates in crime was Garland Atkinson, a witness at Atkins' trial, of whom more later. Nor is it disputed that Atkins was a long-time friend of Inglet, that he knew Inglet was a cocaine dealer, and that whenever Inglet visited Miami to obtain cocaine from his source there he stayed with Atkins at his residence. All of the above was admitted by counsel for Atkins either in his opening statement to the jury or in his summation, most of it in both. It was Atkins' contention that despite this he was not involved in Inglet's crimes and, of course, the above—while reflecting severely on his taste in friends—does not show that Atkins was a criminal.

1. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

2. Inglet was convicted in an earlier trial.

3. Where we set these out, we omit various vulgarities and obscenities, employed for emphasis or punctuation but without other significance, as well as irrelevant accounts of personal adventures, chiefly amorous.

The first taped conversation between Atkins and Inglet upon which the prosecution relied to indicate Atkins' complicity took place on the evening of November 20, 1977. Inglet had returned from Miami with a pound of cocaine, which he and Atkinson "cooked" the next day. Atkins called him from Miami:

ATKINS: Andy this Bob . . .
INGLET: Hey.
ATKINS: Hey.
INGLET: What's going on?

At trial, the prosecution sought to bridge the gap between Atkins' mere presence, knowledge and friendship with Inglet and his claimed participation in Inglet's crimes with evidence of several taped telephone conversations between the two during a two-week period in late November and early December of 1977. Before examining these conversations in detail, we note a few other items of relevant evidence that bear upon them. The record indicates that Inglet processed, or "cooked" his cocaine in a microwave oven, which had the effect of converting it from a powder into a rock-like cake. For some reason this increased its value and merchantability. Garland Atkinson, a confederate of Inglet who turned state's evidence, testified that within the conspiracy this process was referred to as "taking pictures," and the cake so produced was the "picture." He also testified that "weather" was a code term for cocaine. Finally, the evidence indicates that when Inglet visited Miami and stayed with Atkins, he customarily notified Atkins of his times of arrival, was met by him at the airport and returned by him to it at the end of his visit, and was usually the recipient of a follow-up call or calls from Atkins on his return to Houston. With this background, we turn to the taped conversations and their context, set out at length in the margin.[3]

Examining this sequence of conversations in the context of their relationship to In-

ATKINS: Just watchin' a little tube, what about you?
INGLET: Just the same thing.
ATKINS: Yeah, I just wanted to make sure that, you know, you were at home.
INGLET: Yea, I made it home, everything's fine. Just haven't got up with too many people though, everybody's kind of gone for the weekend.
ATKINS: Yea, well
INGLET: Uh, uh should know something by, uh, should by, looks like tomorrow afternoon or, uh, no later than 6 o'clock tomorrow.
ATKINS: Yea, well, just kinda holdin it.
INGLET: Yea, well, that's what I'm talking about when I just can't, haven't been able to get up with anybody because of the weekend.
ATKINS: Yea, that's alright.
INGLET: Uh.
ATKINS: Just wanted to make sure you were home.

glet's cocaine-procuring trips to Florida, we conclude that the jury could reasonably have believed that they establish Atkins' participation in Inglet's cocaine scheme.

INGLET: . . . brother I want you to be in your new house when I come back.

ATKINS: Yea, well, signed the paper (unintelligible) yesterday.

INGLET: Yea.

ATKINS: So, I should be moved in.

INGLET: Boy, that's be nice . . . just put my name on one of the bedrooms.

ATKINS: Oh, yea.

INGLET: Yes, sir (laughter).

ATKINS: (laughter)

INGLET: Okay, listen, I'll get back with you, uh, uh, soon as I find out something, it'll be no later than 6 tomorrow.

ATKINS: Okay. Is M.A. [Inglet's wife] back yet?

INGLET: No, I talked to her and she's coming back tomorrow about 5:30.

ATKINS: Yea, alright, still as happy as when you left?

INGLET: Oh yea, uh huh, yeah, everything's fine.

ATKINS: Great.

INGLET: Okay.

ATKINS: Alright.

INGLET: Good talkin to you.

ATKINS: Okay.

INGLET: Bye bye.

As promised, Inglet called Atkins on Monday, November 21, leaving the message on Atkins' recorder that he would be away because of the impending Thanksgiving holiday, which fell on November 24, but urging Atkins to call him if necessary.

The next taped conversation occurred on the following Monday, November 28, when Atkins called Inglet in Houston about noon:

M. A.: Hello.

ATKINS: Well, hello, Lady.

M. A.: Hello.

ATKINS: This is Bob.

M. A.: Coming up there so you can take some pictures.

ATKINS: Huh.

M. A.: I'm gonna come up so you can take some pictures.

ATKINS: Oh yea?

M. A.: So get your camera ready.

ATKINS: Whens this gonna happen?

M. A.: I don't know, hold on a minute.

INGLET: Hey.

ATKINS: Hey.

INGLET: What's goin on?

ATKINS: Chuckle, just down here in the hot sunshine.

INGLET: How was your holiday?

ATKINS: Uh it was fantastic.

ATKINS: All the people you run into get happy?

INGLET: Yea, they all happy.

ATKINS: I figured they were; chuckle.

INGLET: Yea, no complaints.

ATKINS: Huh.

INGLET: No complaints.

ATKINS: I know, I wish I'd kept some.

INGLET: Yea, should have, it'll be around again.

ATKINS: That's the way it goes though.

INGLET: You can't spoil em all the time.

ATKINS: Todays Tuesday isn't it.

INGLET: No, Monday.

ATKINS: Sure?

INGLET: Yea yesterday was Sunday.

ATKINS: Chuckle, I've lost a few days here.

INGLET: Oh, I do too during the week.

ATKINS: Allright, allright, . . . tell you all hello when I see you Wednesday, huh.

INGLET: Yea.

ATKINS: Awright, that's good.

INGLET: So how else is everything?

ATKINS: Ah just great.

INGLET: Good.

ATKINS: (unintelligible)

INGLET: It warm down here man today, it's hotter than hell.

ATKINS: Oh, the weathers startin to turn tomorrow and it's supposed to be beautiful in about a week.

INGLET: Yea, good, good enough, awright, OK, I'll give you a call.

ATKINS: O.K.

INGLET: Awright Bye.

On November 30 Inglet called Atkins, was met by him at the Miami airport, and stayed at his home overnight. He returned to Houston the following day with a pound of cocaine. On December 2 Inglet "cooked" the cocaine and Atkins called, "checking to make sure everything was going all right." He called again on December 4, and the following conversation took place:

INGLET: Hello.

ATKINS: Hello, fellow.

ATKINS: Oh, well how's everything going?

INGLET: Well, good, Just about gone.

ATKINS: Didn't have any trouble with that did ya?

INGLET: Uh, nah, not anything I can say, you know.

ATKINS: Uh, it wasn't as good as the last.

INGLET: No, it's, uh, it's all right.

ATKINS: It's different if the money was there.

INGLET: Yeah, uh, no everything was fine.

ATKINS: All right.

INGLET: I can't complain. Couple of bitches, but I get those every time. If they don't bitch then I figure they're not, you know . .

ATKINS: (laughs)

INGLET: (laughs) They got to bitch.

ATKINS: I was just wondering when you was gonna come over to see me again.

Despite their veiled language and Delphic references, a clear pattern emerges from these conversations of Atkins' concern with Inglet's goings and comings, with how his activities progressed after he returned with cocaine, and with the reaction of persons dealing with Inglet. Particularly revealing is Atkins' expression of regret in the conversation of November 28 that he had not "kept some" since it was so good, an indica-

> INGLET: Uh.
> ATKINS: Later or what.
> INGLET: Yeah, probably so, but I'll give ya a call and let you know.
>
> .         .         .         .         .
>
> ATKINS: All right. Well, glad to hear you're going so well.
> INGLET: Yeah, . . . man, it's uh, like ah, all I'm doing right now is waiting on the cash. I got, the last of it was, uh, everything's fine. Can't complain.
> ATKINS: Good.
> INGLET: So I'll be calling you Tuesday.

Late on the afternoon of Tuesday, December 4, however, Atkins called Inglet:

> INGLET: Hello.
> ATKINS: Andy?
> INGLET: Yeah.
> ATKINS: Bob.
> INGLET: Hey, Bob.
> ATKINS: What's going on?
> INGLET: Oh, Man, it was another all nighter last night. I didn't even come, we just got in about thirty minutes, ago.
> ATKINS: I just got my new house about thirty minutes ago.
>
> .         .         .         .         .
>
> INGLET: You already got your phone?
> ATKINS: There's a guy that, uh, just moved out. Phone's in here, but I want to give you my new number.
> INGLET: Okay.
> ATKINS: It's gonna be hooked up tomorrow.
> INGLET: Allright. Rattle it off.
> ATKINS: Four-four-two.
> INGLET: Did you know Mike's down there?
> ATKINS: Uh uh.
> INGLET: Yeah, he's somewhere in Miami. Uh, I talked to Joe yesterday. He came over here.
> ATKINS: Yeah.
> INGLET: And said that he was down there visiting his parents or somebody. I don't know who's down there.
> ATKINS: Hum.
> INGLET: Allright, four-four-two?
> ATKINS: Oh-two-seven-six.
> INGLET: Allright. Nobody gets this number but me.
> ATKINS: So Mike didn't try to look me up.
>
> .         .         .         .         .         .
>
> ATKINS: When are ya'll gonna come go swimming?

tion that Atkins at one time had dominion over what Inglet received, with the right to retain what he wished. If the jury believed witness Atkinson's glossary of code terms, as under *Glasser* we presume they did, doubt vanishes: when "weather" refers to cocaine, "taking pictures" to cooking it to hardness, and so forth, the conversations become frank discussions of drug trafficking.[4]

> INGLET: Uh, Man, I just got a call from, uh, down around McAllen, and, this morning, and we wasn't here and, uh, I called back down there, and I'm kinda waiting for him to call me on some of those other little things.
> ATKINS: Yeah.
> INGLET: And, uh, it looks like probably some time this week, but I don't know for sure what day yet till, ah, he gives me a call back. If he gives me a call I might be going down there, and, uh, taking a day vaca—couple of days vacation down there at McAllen seeing M. A.'s family and everything. And, uh, today's Tuesday, Wednesday, Thursday. It should be before the weekend.
> ATKINS: Allright. Well, if the things are gonna happen tomorrow. . . .
> INGLET: Uh.
> ATKINS: I've been waiting on them a long time.
>
> .         .         .         .         .
>
> INGLET: . . .. How's everything else been going, Man?
> ATKINS: Oh, just great.
> INGLET: Good.
> ATKINS: No complaints at all.
> INGLET: Good enough. Uh, no, I still have a little, uh, little bit collecting to do on a couple of cars I have out which they should be coming in probably, uh, well, . . . I just haven't I wasn't here today, this morning. Just got in like I said about thirty or forty minutes ago.
> ATKINS: Yeah.
>
> .         .         .         .         .
>
> INGLET: Well, I should be down to go take a dip for, uh, before the weekend.
> ATKINS: Great.
> INGLET: Okay, Man. Well, take care and get everything straightened up down there now.
> ATKINS: I will.
> INGLET: Allright.
> ATKINS: Allright.
> INGLET: Bye, bye.

**4.** We recognize the hazards involved in permitting dubious witnesses such as Atkinson to impute sinister meaning to facially innocent language. Accordingly, we have scrutinized these conversations with special care and have found that, in the context of Inglet's activities,

In addition to attacking the sufficiency of the evidence, Atkins raises numerous other challenges to his conviction. He charges that the court below erred in failing to suppress certain wiretap evidence and co-conspirators' statements, in refusing to admit allegedly exculpatory statements contained in Inglet's prior testimony and in letters written to him by Inglet, and in refusing to give the jury an instruction he requested. He also attacks his sentence as unfairly severe in comparison with those given others convicted of the conspiracy.

*The Motion to Suppress Wiretap Evidence*

The defendant filed a pretrial motion to suppress evidence of the telephone conversations monitored by authority of a federal district court wiretap order in Houston. He also moved to adopt his codefendants' motions to suppress conversations monitored by authority of a Florida state court wiretap order. The motions were denied. Defendant argues on appeal that his suppression hearing was impermissibly curtailed. He also argues that because much of the probable cause for the Houston (federal) wiretap was supplied by information resulting from the Jackson (state) wiretap, he is entitled to attack the validity of the state wiretap. Atkins further contends that the state and federal wiretaps were infirm because investigative techniques other than the wiretap were not pursued.

■■ The scope of cross-examination in evidentiary hearings is committed to the trial court's discretion. *United States v. Brunson*, 549 F.2d 348, 360 (5th Cir. 1977); and the decision of the judge below to curtail some of the defendant's cross-examination during the four-day suppression hearing was not an abuse of discretion denying him a "meaningful opportunity to be heard."

In holding the wiretap evidence admissible, the judge below ruled that the validity of the Florida wiretap was determined by Florida law, provided that the statutory authorization comported with constitutional standards, including probable cause. He therefore followed the decision of the Florida judge authorizing the wiretap order in finding that the statutory requirements had been met. He also ruled that the federal wiretap order was valid.

■ We agree with the trial judge's evaluation of the wiretaps' legality. The Florida wiretap law has been held to be constitutional by this court. *United States v. Hyde*, 574 F.2d 856, 862 n. 3 (5th Cir. 1978). The Florida judge correctly found that the affidavit supporting the Florida wiretap order supplied probable cause: the affidavit included detailed information as to the suspected conspirator "Eddie," whose phone was to be tapped, as well as information based on a tip from a confidential informant and verified by subsequent police investigation. Moreover, the affidavit avowed, and the trial judge found, that investigative techniques such as surveillance, further use of confidential informants, immunity for known conspirators, and interviews with known associates of Eddie were likely to be unsuccessful in uncovering the rest of the conspirators. The "other investigative procedures" requirement was thus met. This requirement is to be read in a common-sense fashion and is intended simply to assure that law enforcement officers do not resort to wiretapping in situations where traditional investigative techniques would adequately expose the crime. *See United States v. Hyde*, 574 F.2d at 867 (interpreting "other investigative procedures" requirement of federal wiretap statute).

> Courts will not invalidate a wire–tap order simply because defense lawyers are able to suggest *post factum* some investigative technique[s] that might have been used and [were] not. It is enough if the affidavit explains the prospective and retrospective failure of several investigative techniques that reasonably suggest themselves.

their language is not innocent. Indeed, portions of them make little facial sense at all but gain a great deal of meaning when viewed as coded references to dealings in the cocaine.

*Id.* The Florida state court order and supporting affidavits indicate that the feasibility of other investigative techniques was examined and establish the validity of the Florida wiretap.

■ Much the same analysis and the same result applies to the federal wiretap order. The federal wiretap statute, too, has been held constitutional by this court. *United States v. Sklaroff*, 506 F.2d 837, 840 (5th Cir. 1975). The wiretap order complied with the requirements of this statute. An affidavit, submitted by DEA Agent Gospadarek, relied in part on the information uncovered by the Florida wiretap and established probable cause. Moreover, the DEA agents used other investigative techniques, including surveillance, a pen register on Inglet's phone, and drug purchases by undercover agents. Therefore, defendant's attack on the denial of his motions to suppress wiretap evidence is without merit.

### Admission Of Coconspirators' Statements

■ The introduction of coconspirators' statements in this case is governed by the rule of *United States v. Apollo*, 476 F.2d 156 (5th Cir. 1973), and *United States v. Oliva*, 497 F.2d 130, 132–33 (5th Cir. 1974), because *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc), was handed down after the trial and was made prospective in application. The applicable case law required the government to prove prima facie, by evidence independent of the hearsay statements of coconspirators, the existence of a conspiracy and the defendant's knowledge and participation in its before admitting hearsay statements by coconspirators. The independent evidence in the present case, as we have held above, was sufficient to support admission of coconspirators' statements. The taped conversations between defendant Atkins and defendant Inglet sufficiently established the existence of a drug conspiracy and Atkins' participation in it.

### Refusal To Admit Inglet's Prior Testimony And Letters

After the first trial, where a jury deadlocked on the issue of Atkins' guilt but convicted Inglet, Inglet allegedly wrote letters to Atkins expressing his regret that Atkins had been ensnared in the ongoing legal troubles because of his friendship with Inglet. The letters contained statements indicating that Atkins was only Inglet's friend and not a coconspirator and tending to support Atkins' innocent interpretations of some of the taped phone conversations between them. Before the second trial began, Inglet was declared an unavailable witness because he refused to testify when his family was threatened with reprisals if he did so. Atkins then sought to introduce Inglet's letters and his prior testimony from an earlier *James* hearing.

The trial court denied admission of Inglet's letters and prior testimony. It ruled that the letters were not admissible because "the interests of justice would not be served" and because "the government had no opportunity to cross-examine the letters." It also ruled that the prior testimony was not admissible under Fed.R.Evid. 804(b)(1). The defendant claims that the letters should have been admitted in the interests of justice under Fed.R.Evid. 803(24), 804(b)(5), and as statements against penal interest under 804(b)(3). He also urges that the *James* hearing testimony qualified for admission under Rule 804(b)(1).

■ The judge's refusal to admit the letters was not an abuse of discretion. The defendant did not provide the government with notice of his intention to offer the letters in advance of his attempt to do so, as Fed.R.Evid. 803(24) and 804(b)(5) require. *See, e. g. United States v. Ruffin*, 575 F.2d 346, 358 (2d Cir. 1978) (Congress intended notice requirement to be rigidly enforced, and evidence can be admitted under Fed.R. Evid. 803(24) only if notice of an intention to rely upon it is given in advance to trial). Moreover, the letters lacked circumstantial guarantees of trustworthiness equivalent to the specific hearsay exceptions listed in Rules 803 and 804 and were not against penal interest as required by 804(b)(3).

After the first trial, in which Inglet was convicted and sentenced to 43 years, and

before Atkins' second trial began, Inglet agreed to testify for the government in exchange for a reduction of his sentence to ten years. Inglet wrote all of the letters after his conviction, one eight days before his sentence was reduced, when it may be assumed that he was contemplating making a pact with the government to lessen his sentence, and two others after sentencing. Therefore, Inglet's "penal interest" was no longer at stake when the letters were written, and they did not derive reliability from tending to be against his penal interests. *See United States v. Gonzalez*, 559 F.2d 1271, 1273 (5th Cir. 1977) (statements after conviction immunity not against penal interests).

In addition, Inglet's relationship to Atkins tended to make the letters unreliable. Assuming that Inglet was Atkins' friend, as Atkins claimed, Inglet could well have been motivated by his friendship to fabricate statements in order to provide Atkins with exculpatory evidence. Also, the letters were written a year after the defendants' apprehension and first trial, in which Inglet was convicted, and this long delay after the beginning of the troubles they addressed would also cast doubt upon their reliability and spontaneity. They were thus properly excluded. *See United States v. Satterfield*, 572 F.2d 687, 693 (9th Cir. 1978).

■ Admission of Inglet's testimony, given during government cross-examination of him in a December 19, 1978, *James* hearing, also was not erroneously denied. Fed.R. Evid. 804(b)(1) permits admission of former testimony if the declarant is unavailable at trial and "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The defendant sought to use Inglet's testimony that his source of cocaine in Miami was a man named Robert, whose last name he did not know, in order to establish that Inglet was dealing with someone other than Robert Atkins, whose name was known to Inglet. Defense counsel for Atkins did not participate in the *James* hearing, and the hearing did not

concern Atkins but only some of his codefendants. In addition, the government did not contend that Atkins was the Miami supplier being discussed by Inglet in the *James* hearing but rather that he was the contact man. Thus, the government did not have the motivation to question Inglet in order to make him acknowledge that the Robert of whom he spoke in the James hearing was in fact Atkins. Accordingly, Inglet's former testimony did not meet the requirements of 804(b)(1) for admission, and his challenge to its exclusion by the judge is without merit. *See, e. g., Peterson v. United States*, 344 F.2d 419, 425 (5th Cir. 1965).

### Jury Instructions on Circumstantial Evidence

■ Defendant protests the court's failure to include in its jury charge an instruction that "the inferences to be reasonably drawn from the evidence must be consistent with the guilt of the accused and inconsistent with every reasonable hypothesis of his innocence." This court has specifically held that

> the "reasonable hypothesis" test applied to circumstantial evidence, i. e., that such evidence must not only be consistent with guilt but must also be inconsistent with innocence, is employed by the *court* in assaying such evidence, but it is not necessary to so instruct the jury when they are instructed properly on "reasonable doubt . . . ."

*United States v. Cortez*, 521 F.2d 1, 4 (5th Cir. 1975). In the present case, the district court clearly gave a more than sufficient instruction on reasonable doubt, and the defendant's challenge to the jury instruction must therefore be rejected.

### Length of Sentence

■ The defendant challenges the length of his sentence compared to that of coconspirators Inglet and Atkinson. Atkins was convicted of seven counts and sentenced to fifteen years. The maximum possible sentence to which he was exposed by his conviction was 40 years. Inglet and Atkinson were each sentenced to ten years.

[I]t is well settled that a federal district judge has wide discretion in determining what sentence to impose, and such a sentence will not be questioned on appeal as long as the sentence is within statutory limits and there is no showing of arbitrary or capricious action amounting to a gross abuse of discretion. . . . A defendant cannot rely upon the sentences which other defendants receive as any yardstick for his sentence.

*United States v. Hayes,* 589 F.2d 811, 826–27 (5th Cir. 1979).

AFFIRMED.