**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Albert ALONZO, Defendant-Appellant.**

**No. 81–1286.**

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1982.

James H. Pearl, San Antonio, Tex. (Court-appointed), for defendant-appellant.

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, POLITZ and TATE, Circuit Judges.

POLITZ, Circuit Judge:

Convicted by a jury of eleven counts of misappropriating postal service funds in violation of 18 U.S.C. § 1711,[1] Albert Alonzo appeals, maintaining that the evidence was insufficient to support the convictions and that the trial court erred in its instructions to the jury and in reading some testimony to the jury after deliberations began. Finding no merit to these contentions, we affirm.

### Background Facts

Alonzo began employment with the United States Postal Service in 1964. In 1970 he was assigned as a window clerk at a station in San Antonio, Texas, a position he maintained until 1973 when he was transferred because of a $2,000 shortage in the funds for which he was responsible. In 1975 he requested and was allowed to return to the window clerk position, an as-

---

1. 18 U.S.C. § 1711 provides in relevant part:
 ·Whoever, being a postal service officer or employee, ... converts to his own use, ... except as authorized by law, any money or property coming into his hands or under his control in any manner, in the execution or color of his office, employment, or service, ... is guilty of embezzlement; ....

signment he continued until his termination in January 1980. Alonzo was indicted on eight counts of converting postal money orders to his own use, and three counts of converting other postal service funds to his own use.

Postal window clerks routinely sell money orders, which are issued to them in numerically sequenced blocks of 100. Each money order is composed of the original and two copies. When a customer purchases a money order, the clerk, using an imprinter, prints the amount, date, number of the issuing post office, the issuing clerk's personal validation markings and a dollar limitation figure on the money order. The customer receives the original and one copy in return for payment of the face amount plus the money order fee. The clerk retains the second copy, the voucher, for post office records.

At the close of business, each clerk gathers the voucher copies, runs an adding machine tape of the face amounts of money orders issued, together with the associated fees, and transcribes and attests this information on a daily financial report known as a Form 1412. The vouchers, tape and Form 1412 are then turned in with the day's cash receipts. The daily financial report includes all money collected from regular stamp transactions, postage due fees, philatelic stamp sales, if applicable, and other postal charges. Alonzo occasionally worked as a back-up philatelic clerk.

Count 1 charged Alonzo with converting a $50 money order dated March 16, 1978. The evidence includes the original money order, bearing Alonzo's validating plate imprint and initials, the Form 1412, and the adding machine tape Alonzo submitted for that date. The $50 is not listed on either the financial report or the tape. The voucher copy was not turned in. The money order was made payable to Linda Ortiz, identified as Alonzo's girlfriend. Count 2 charges conversion of a $20 money order issued March 22, 1978. This money order, bearing Alonzo's personal validation, also was made payable to Ortiz, and not reported on the Form 1412. The daily tape reveals no notation of this amount, the voucher copy is missing.

Alonzo testified that he put the cash for these money orders in his drawer and overlooked reporting the figures. Consistent with this explanation, one would expect a subsequent audit to reflect an overage of $71.40 (the face value of the money orders plus fees). The routine audit made reflected an overage of $1.52.

Count 3 charges conversion of a $150 money order, dated October 10, 1978, payable to Modesta Martinez and cashed in Mexico. The voucher was never turned in, the amount was not listed on the tape or reported on the daily Form 1412, and the money order bears Alonzo's validation. Again, a subsequent audit did not reflect the overage which would have been expected had the cash been turned in. The subsequent audit reflected a shortage of $20.89.

Count 4 relates to a $42 money order issued by Alonzo on February 14, 1979, payable to Town & Country Charge. Alonzo testified that this money order was used to pay his personal account. He paid for the money order after an audit revealed the shortage. In an explanatory note written contemporaneously with the late payment, Alonzo said that he had sold this money order and one other to Ortiz, but had failed to collect the money. Alonzo asserted that he had given Ortiz the funds to pay for this money order but that during the transaction they had had a "spat," she failed to make payment, and he overlooked her omission.

Count 7 involved a money order for $200, issued by Alonzo on December 14, 1979, to Manuel Valdez, whom Alonzo had known since high school. The voucher was not detached, the sum was not listed on the tape or reported on the daily Form 1412, and Alonzo could not recall what happened. The money order bore Alonzo's validation imprint.

Count 8 charged conversion of a $400 money order, issued by Alonzo to Ortiz on December 26, 1979, payable to Alonzo's roommate, Alejandro L. Anderson. Alonzo failed to detach the voucher. The Form

1412 and the tape omit reference to the sum. Alonzo cashed the money order on December 28, 1979. Alonzo testified he gave Ortiz the money to buy the money order for his roommate and subsequently exchanged the money order for the cash.

Count 9 charged conversion of a $126 money order issued by Alonzo to Ortiz on October 23, 1979. This money order was payable to Farmers Texas County Mutual Insurance Company, and was used to pay Alonzo's auto insurance premiums. The voucher was not turned in and the tape and financial report contain no reference to this transaction.

Count 10 involves a $400 money order issued by Alonzo on October 25, 1979. The voucher was not included with that day's group of vouchers, and no reference to this amount is found in the daily tape or Form 1412. Alonzo offered no explanation.

The remaining three counts deal with audit shortages. Count 5 is based on a routine audit conducted by Alonzo's supervisor on October 19, 1979, which revealed a shortage of $1,135.90. After a count and re-count confirmed this deficiency, Alonzo requested time to research his records. He left for lunch and did not return that day; he called in sick. Subsequently, Alonzo brought to the supervisor, 550 two-dollar stamps, reportedly found in a drawer. This $1,100 "find" reduced the shortage to $35.90, within acceptable audit limits. Testimony at trial brought into question Alonzo's explanation. It appears that during the prior audit Alonzo's stamp stock included only 385 two-dollar stamps, 368 of which Alonzo subsequently turned in as "spoiled stock." He did not requisition any additional two-dollar stamps during the interim and had only two left when the supervisor first checked his stock. The appearance of the 550 two-dollar stamps caused the supervisor to make a written report to postal system examiners.

Count 6 grows out of a surprise audit on November 8 and 9, 1979, thirteen working days after the routine audit. This examination disclosed a shortage of $3,512.03. Alonzo claimed this deficit resulted from large transactions with stamp collectors. He declined to identify any collector. He obliquely referred to trading in stamps with collectors and other clerks. No meaningful details of these transactions were provided.

Count 11 is the product of another unannounced audit, conducted January 10, 1980, which revealed a shortage of $1,870.52. Alonzo blamed this loss on the disappearance of some of his stamp inventory during the Christmas season rush.

### Sufficiency of the Evidence

 Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accepting all credibility choices made that tend to support the jury's verdict, *United States v. Allison*, 616 F.2d 779 (5th Cir. 1980), *cert. denied*, 449 U.S. 857, 101 S.Ct. 156, 66 L.Ed.2d 72 (1981), a reversal is in order only if we conclude that a reasonable jury was bound to resolve that guilt was not proven beyond a reasonable doubt. *United States v. Khamis*, 674 F.2d 390 (5th Cir. 1982); *United States v. Rodriguez*, 654 F.2d 315 (5th Cir. 1981).

Alonzo's challenge to the sufficiency of the evidence is based principally on our recent decision in *United States v. Rodriguez*, 654 F.2d 315 (5th Cir. 1981). Rodriguez was employed at the same San Antonio post office as Alonzo until his indictment for conversion of postal funds in violation of 18 U.S.C. § 1711. The indictment specifically charged conversion of $109.89, $102.33 and $118.80. These sums were paid, on three different dates, as pre-arranged postage due charges, under surveillance, to test Rodriguez. Rodriguez failed to give cancelled stamps or a postage meter strip for the amounts received. Rodriguez was indicted after an audit of his account a few days after these observed transactions reflected a shortage of $534.77.

As we noted in our opinion, the government's theory of Rodriguez's conversions was based on his failure to disburse either cancelled stamps or meter strips equal to the postage due monies received, ostensibly

enabling him to pocket these funds undetected. However, the government also introduced evidence of a shortage, reflected by the audit, of $534.77, as further proof of the conversion. Confronted with this inherent conflict we observed:

> Standing alone, either the theory of Rodriguez' conduct or the shortage of Rodriguez' account would be appropriate considerations concerning the possibility of conversion of postal monies. But standing together the theory of conduct and the shortage of account are inconsistent, for if Rodriguez had, as the government contended, refused to disburse cancelled stamps or meter strips in order to conceal his pocketing of those monies, no shortage would have resulted from an audit. It follows, therefore, that any shortage reflected by the October 5th audit would not be probative of conversion of monies by Rodriguez as theorized by the government.

*Id.* at 318.

The evidence in the record before us markedly differs from that offered in Rodriguez's trial. No direct evidence linked Rodriguez to the amounts involved, other than his failure to follow prescribed procedures and issue cancelled stamps or postage meter strips. In the case at bar, there is proof which the jury could find sufficient to link Alonzo to the postal money orders, in addition to his failure to follow prescribed procedures and turn in the voucher copies, note the amounts on the daily tapes and report the transactions on the daily financial reports.

■ Two of the money orders were secured by, made payable to, and cashed by Linda Ortiz. Two were secured by Ortiz and made payable to Alonzo's creditors. One was secured by Ortiz, made payable to Alonzo's roommate and subsequently cashed at Alonzo's window. As to these five transactions, the link to Alonzo is strong and fast. The evidence as to the other three money orders is circumstantial, but considering the totality of the evidence, it was not unreasonable for the jury to infer an adequate causal connection with Alonzo.

This evidence, of course, included Alonzo's explanation for failing to turn in the vouchers, failing to list the sums on the daily tapes, and failing to report the sums on the daily financial reports. If the charges in Counts 3, 7 and 10 were considered in a vacuum, the question of the sufficiency of the evidence would be serious. But the evidence before the jury, and the record before us, admits of no such vacuum. The jury's verdict on these counts is sufficiently supported by the evidence.

■ The charges for the audit shortage in Counts 5, 6 and 11, present a similar quantum of evidence appraisal. The audit on October 19, 1979, disclosed a shortage of $1,135.90. After leaving for a lunch break, which extended for the balance of the day, Alonzo returned two days later to report that he had found 550 two-dollar stamps. The evidence reflects very little postal activity involving this particular stamp; it was sold primarily to collectors. The prior audit showed that Alonzo had 385 of these stamps, 368 of which were returned "spoiled." He had two left in his inventory on October 19. No additional two-dollar stamps had been requisitioned in the meantime. The record is silent as to how the 550 stamps Alonzo "found" in his personal papers came to be in his possession. There is only a vague, passing reference to trading in stamps with collectors and other clerks. The jury obviously discounted his explanation for this significant shortage.

The audit less than three weeks later uncovered a shortage of $3,512.03. Alonzo was advised of his right to remain silent. Thereafter he explained that he had apparently been shorted in stamp transactions with one or more collectors. He declined to identify the collector or collectors to the postal auditors because he did not want to get them "in trouble." This declination continued during Alonzo's testimony at trial; no collector is identified. The jury was not persuaded. Considering the totality of the evidence, including that reflecting Alonzo's inventory of stamps with philatelic interest during the October and November audits, the volume of his philatelic activity,

and his exegesis of the shortage, we are not prepared to say that a reasonably minded jury would be compelled to conclude that his guilt was not proven.

The final audit on January 10, 1980, disclosed a deficit of $1,870.52. After being advised of his constitutional rights Alonzo declined to discuss this deficiency, as he was entitled to do. At trial he testified that the shortfall was caused by the holiday rush, and his placing of some of his stock in a cabinet on wheels known as a "rolling account." According to Alonzo, early in 1979 he had lost a key to this cabinet; the locks were not changed and he continued to use it. By vague, non-specific reference, Alonzo suggests that the combination of the holiday press and the use of his rolling account, which was not absolutely secure, accounted for this loss. The jury was not persuaded.

Within the limited constraints of our review, considering the totality of the evidence presented to the jury, we are not prepared to say the conviction is unwarranted. The question is not whether we, sitting as a jury, would have found Alonzo guilty, but rather "whether in our judgment a reasonably-minded jury could do so," *United States v. Atkins*, 618 F.2d 366, 368 (5th Cir. 1980). The record contains sufficient evidence, from which sufficient reasonable inferences could be drawn, to preclude our declaring that a reasonable jury would have to conclude that guilt was not proven beyond a reasonable doubt.

### Jury Instructions

Alonzo contends the trial court erred in declining to instruct the jury that the evidence must exclude every reasonable hypothesis but guilt. Alonzo acknowledges that the law in this circuit is contrary to this contention. As we stated in *United States v. Atkins*, 618 F.2d 366 (5th Cir. 1980), appellate courts use the "reasonable hypothesis" test; "it is not necessary to so instruct the jury when they are instructed properly on 'reasonable doubt ....'" *Id.* at 373 (*quoting United States v. Cortez*, 521 F.2d 1, 4 (5th Cir. 1975)). As one of the last en banc decisions by the Former Fifth Circuit opined:

It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (citations omitted).

The court instructed the jury as follows on reasonable doubt:

Indeed, the defendant is presumed, by law, to be innocent. The law does not require a defendant to prove his innocence or to produce any evidence at all. The government, as you know, has the burden of proving the defendant's guilt beyond a reasonable doubt, and if it fails to do so, then you must acquit him as to that count which you are then considering.

Thus, while the government's burden of proof is a strict or a heavy burden, it is not necessary that the defendant's guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the defendant's guilt as to that count which you're then considering.

Now, a reasonable doubt is a real doubt based upon reason and common sense after a careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

■ The charge is proper. *United States v. Prince*, 515 F.2d 564, 566 n.1 (5th Cir.), *cert. denied, Craft v. United States*, 423 U.S. 1032, 96 S.Ct. 563, 46 L.Ed.2d 406 (1975).

### Reading of Testimony

After beginning its deliberations, the jury sent a note to the judge asking whether it was Alonzo or his union that requested his reinstatement as a window clerk after his removal in 1973. The judge allowed two

portions of the testimony to be read to the jury. Defense counsel objected, stating that the judge selectively picked the testimony, and that this selection constituted a comment on the weight of the evidence. Alonzo re-urges this argument on appeal.

The two portions of testimony read to the jury consisted of the testimony of Postal Inspector Santa Cruz, who testified that Alonzo requested reinstatement as a window clerk, and of Alonzo, who acknowledged that he requested reinstatement. The jury was instructed that the court did not intend to substitute its judgment for that of the jury, or to invade its province as a factfinder. Care was taken to read testimony offered by both the prosecution and the defendant. Although Alonzo suggests that the trial judge was improperly selective in designating the testimony to be read, we are not directed to any other relevant testimony.

Our review of the record discloses no significant testimony, bearing on the questions posed by the jury, which was excluded from the response to the jury's request. There is no merit to the contention that the trial judge abused his discretion in permitting a portion of the testimony to be read to the jury. *United States v. Alfonso*, 552 F.2d 605 (5th Cir. 1977).

The convictions are AFFIRMED.