734 F.2d 1428
 Blue Sky L. Rep. P 72,050, 15 Fed. R. Evid. Serv. 1340
Donald N. LLOYD and Jessica Lloyd, Plaintiffs-Appellants,
Cross-Appellees,
v.
PROFESSIONAL REALTY SERVICES, INC., et al.,
Defendants-Appellees, Cross-Appellants.
 No. 83-7092.
 United States Court of Appeals,
Eleventh Circuit.
 June 22, 1984.
 
 Robert B. Eubank, Birmingham, Ala., for plaintiffs-appellants, cross-appellees.
 Allwin E. Horn, III, Spain, Gillon, Riley, Tate & Etheredge, J. Mark Hart, Birmingham, Ala., for defendants-appellees, cross-appellants.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Appellants Donald and Jessica Lloyd brought suit against appellees Professional Realty Services, Inc. and directors of the company for violations of state and federal securities laws and for fraud resulting from an attempted purchase of the company's stock. The district court granted appellees' motions for directed verdict on all counts and also granted a directed verdict for the Lloyds on a counterclaim filed by appellees. We affirm.
 
 I.
 
 2
 In 1977, the Lloyds became interested in joining a real estate franchising organization. They held meetings in Alabama with representatives of Professional Realty Services, Inc. ("PRS"), a company holding an exclusive regional franchise issued by Realty World Corporation. During these meetings, the Lloyds discussed buying a local franchise in Mobile and stock in PRS. They also met the stockholders of PRS and were given access to the financial records of the company.[1]
 
 
 3
 On February 9, 1978, the Lloyds were offered 60,000 shares of PRS stock at $.50 per share.[2] They accepted on the condition that Donald Lloyd would be employed as a managerial employee of PRS. Payment of $30,000 was made in the succeeding months.[3]
 
 
 4
 Shortly after accepting the offer of stock, Donald Lloyd became actively involved in the business affairs of PRS. He was elected to the company's Board of Directors, opened a PRS office in Mobile, and eventually was appointed Regional Director of the company. Jessica was similarly active. She was employed by PRS as an administrative assistant, elected to the Board of Directors, and eventually made president of the company. The couple's involvement continued until their disassociation from PRS in the Spring of 1979.
 
 
 5
 In August, 1978, a stockholders' meeting was held at which the Lloyds proposed to buy 120,000 additional shares of stock for $60,000. Between that time and March of 1979, the Lloyds paid $40,000, but before making the final $20,000 payment they submitted a letter of resignation.[4] No additional stock was ever issued to the Lloyds.
 
 
 6
 The Lloyds filed this action against PRS and its directors (jointly referred to as PRS) in the Alabama state courts, seeking rescission of the securities sale and damages under state and federal law. Their principal claims were that PRS improperly made a sale of stock while "insolvent" under Alabama law, that the company sold stock to them in violation of state and federal registration requirements, and that the payment of $40,000 for the never completed second stock sale was induced by fraudulent behavior on the part of PRS. PRS counterclaimed, alleging that the Lloyds had converted company records at the time of their resignation. The suit was removed to the United States District Court for the Northern District of Alabama[5] and, after a five-day jury trial, the court granted PRS' motions for directed verdict against all of the Lloyds' claims. The court also granted the Lloyds' motion for directed verdict against PRS' counterclaim. Each party contests the directed verdicts entered against it.
 
 II.
 
 7
 Our discussion focuses on two principal issues, whether PRS improperly sold stock while insolvent and whether it sold stock in violation of state registration laws.[6]
 
 A. Sale of Stock While Insolvent
 
 8
 Article 1 of the Alabama security statute sets out the general provisions regarding registration and transfer of securities. Ala.Code Sec. 8-6-1, et seq. (1977). A person who offers to sell a security in violation of any provision of this article is liable to the buyer in a civil action rescinding the transaction. Ala.Code Sec. 8-6-19.[7]
 
 
 9
 At the time of the stock sale to the Lloyds, one provision of the article ruled that a person selling securities of an issuer known to be insolvent would be criminally liable for embezzlement. Ala.Code Sec. 8-6-20 (1977).[8] The Lloyds' claim that PRS was insolvent in February, 1978, and that the sale therefore violated the statute.[9] They further argue that this statutory violation creates an action for rescission under Sec. 8-6-19.
 
 
 10
 At the close of the Lloyds' case, the district court granted a directed verdict against them. It reasoned that Sec. 8-6-20, clearly discussing criminal liability, was not intended by the state legislature as a basis for civil liability under Sec. 8-6-19. The court read the subsequent repeal of Sec. 8-6-20 and the current regulation of embezzlement by the Alabama criminal law as support for its conclusion that the statutory civil remedy was unavailable.
 
 
 11
 While the Lloyds argue that the district court improperly interpreted the now-repealed Alabama law, we need not decide that issue. Instead, based on a close reading of the record, we conclude that the Lloyds did not put on a prima facie case of "insolvency" so as to warrant relief under the statute.
 
 
 12
 Ala.Code Sec. 8-6-20(b) defined "insolvency" as follows:
 
 
 13
 For the purpose of this section, an issuer shall be deemed insolvent whenever the aggregate of its property at a fair valuation shall not be sufficient in amount to pay its debts.
 
 
 14
 The sole evidence adduced by the Lloyds to show insolvency was PRS' affirmative response to a request for admissions served before the insolvency issue was actually in the case. The admitted requests read as follows:
 
 
 15
 1. As of January 31, 1978, the financial statement prepared internally by employees of Professional Realty Services, Inc., (PRSI) showed debts totally in excess of the book value of its assets.
 
 
 16
 2. As of January 31, 1978, and at all times thereafter, the total of the debts of PRSI shown on such internally prepared financial statements exceeded the value of its assets.
 
 
 17
 We cannot conclude that these admissions, standing alone, created a jury issue on insolvency. The term "book value" as used in the first request obviously is not equivalent to "fair valuation," the standard used by the statute. In the second request, the term "value" in context clearly refers to book value. Without additional evidence going to fair market value, there was not sufficient evidence to enable a reasonable jury to conclude that the aggregate of PRS property at fair market value was insufficient to pay off the debts of the company.[10] See Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (directed verdict appropriate when evidence is so one-sided that "reasonable men could not arrive at a contrary verdict").[11]
 
 
 18
 B. Failure to Comply With Registration Requirements
 
 
 19
 Ala.Code Sec. 8-6-4 (1977) renders it unlawful to offer or sell securities in Alabama unless they are "registered" in accord with other provisions of the act or subject to various statutory exemptions. It is undisputed that the PRS stock was not registered with the State Securities Commission. Therefore, the Lloyds claim that the "unlawful" sale created civil liability under the remedial provisions contained in Sec. 8-6-19.[12]
 
 
 20
 PRS argues that its stock offers were exempted from registration requirements by various exceptions contained in Ala.Code Sec. 8-6-11 (1977). That section provides, inter alia, that registration requirements will not apply to "small offerings," i.e., offerings made to fewer than 10 people during any period of twelve consecutive months. Ala.Code Sec. 8-6-11(a)(9).
 
 
 21
 At trial, the Lloyds introduced evidence to show that PRS had made numerous offers of its stock prior to the February, 1978, offer to the Lloyds. At the close of the plaintiffs' case-in-chief, the trial court found that there had been sufficient proof of seven offers to allow submission to the jury, but that other purported offers were too insubstantial to be submitted. The court nevertheless denied a motion by PRS for directed verdict at that point, correctly holding that the Lloyds had met their initial burden simply by proving that PRS had sold unregistered stock.
 
 
 22
 The PRS defense case consisted principally of testimony by company officials that there had not been any offers in addition to the seven shown by the Lloyds. During rebuttal, the Lloyds showed two more offers. They also attempted, unsuccessfully, to introduce evidence of an offer by PRS employee Norwood to "nine doctors from Stone Mountain, Georgia." The district court, ultimately counting only nine offers, found that PRS had shown its entitlement to the "small offering" exemption and thus granted a directed verdict.
 
 
 23
 In reviewing the directed verdict for PRS, we consider three aspects of the court's ruling: (1) whether the court appropriately excluded the evidence concerning the Norwood offer, (2) whether it ruled correctly that various purported offers were too weakly supported to be submitted to the jury, and (3) whether directed verdict was inappropriate because the jury, on its own, could have believed that more offers had been made.
 
 
 24
 1. The Norwood Offer: During their rebuttal case, the Lloyds attempted to introduce evidence that PRS employee Robert Norwood had made stock offers to "nine doctors from Stone Mountain, Georgia" sometime prior to the October 1977 meeting of the PRS board. Evidence of this offer was contained in a draft version of minutes of the October 1977 board meeting. The Lloyds sought to introduce this draft through corporate secretary Gerry Bates or, in the alternative, have Bates testify about her recollection of Norwood's purported offers. At the time of trial, Norwood was not available to testify.
 
 
 25
 The Lloyds argued that the evidence, apparently hearsay, was admissible via three exceptions to the general proscription against such testimony. The district court found each exception inapplicable and disallowed the testimony.
 
 
 26
 On appeal, the Lloyds reassert the reasons for which this testimony should have been admitted. They first claim that the draft minutes were "business records" admissible pursuant to Fed.R.Evid. 803(6). Although the draft minutes had been prepared by the corporate secretary, the trial court excluded them because they were not "trustworthy."[13] The draft was marked and edited and was quite different from the final copy of the minutes which had been previously entered in evidence. The court did not abuse its discretion by excluding the draft minutes for this reason.
 
 
 27
 The Lloyds further claim that Bates should have been allowed to testify about Norwood's statements because they were admissions by a party-opponent. Fed.R.Evid. 801(d)(2). The trial court refused to find Norwood's statements to be "admissions" of PRS unless the Lloyds could show that Norwood had some authority.[14] Because the Lloyds could not show any such authority, it was appropriate to reject this asserted ground for admission of the evidence.
 
 
 28
 The Lloyds' final contention is that the testimony as to Norwood's statements was admissible under Fed.R.Evid. 804, which governs the admissibility of statements where the declarant is unavailable at the time of trial. It is undisputed that Norwood was "unavailable" as defined by that rule.
 
 
 29
 The district court refused to allow the testimony pursuant to Fed.R.Evid. 804(b)(5) because the Lloyds had not complied with the rule's procedural requirement, which reads as follows:
 
 
 30
 a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the defendant.
 
 
 31
 We accept the district court's ruling on this ground. Although both parties had been present at a deposition of Bates nine months before trial, thus negating any possibility that her testimony would come as a surprise, the Lloyds failed to notify PRS that she would appear as a witness at trial to discuss Norwood's statements. While some appellate courts have affirmed district court findings that an adverse party's knowledge of the substance of the testimony will render formal notice unnecessary under this provision, Piva v. Xerox Corp., 654 F.2d 591 (9th Cir.1981); Furtado v. Bishop, 604 F.2d 80 (1st Cir.1979), cert. denied, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980),[15] these cases do not suggest that a trial court following the strict language of the rule to exclude testimony is guilty of an abuse of discretion. Because the Lloyds did not comply with the requirement here, the testimony was appropriately excluded.
 
 
 32
 2. Offers Ruled Insufficient: The district court considered testimony as to various offers allegedly made by PRS, including an alleged offer in April 1978 to the nine existing shareholders of the company, and found the allegations insufficient to warrant submission to a jury. We have examined the evidence on each of the purported offers and concur with the district court's rulings.
 
 
 33
 3. Propriety of Directed Verdict: The Lloyds claim that the jury should have received this case, even given that only nine offers had been shown. They argue that the jury could have found that other offers, not testified to at trial, may have been made so as to deprive PRS of the "small offering" exception.
 
 
 34
 In the absence of any other sufficient evidence suggesting offers by PRS, it was not error for the district court to grant a directed verdict for the company. While nine offers were sufficiently established, evidence as to any other offers was correctly judged insufficient by the court to warrant submission to the jury. There would have been no basis for the jury to rule that more than nine offers had been made. Because there was no sufficient evidence to reasonably support a contrary decision, the directed verdict was appropriate. Krivo Industrial Supply Co. v. National Distillers & Chemical Corp., 483 F.2d 1098, 1101-02 (5th Cir.1973).
 
 
 35
 4. Conclusion: Having examined the record, we affirm the district court's grant of directed verdict for PRS on the "small offering" exception to Alabama securities registration requirements.
 
 III.
 
 36
 For the foregoing reasons, we affirm the district court on all issues.
 
 
 37
 AFFIRMED.
 
 
 
 [1]
 The company's records, as well as discussions with Realty World officials, apprised the Lloyds of PRS' poor financial condition
 
 
 [2]
 At the time, this constituted 26% of the company's outstanding stock
 
 
 [3]
 The final payment was made on April 4, 1978, and the stock certificate, issued in Jessica Lloyd's name, was delivered on May 24 of that year. Under Alabama law, a sale of securities is not complete until the actual delivery of the security. Ala.Code Sec. 7-8-301(1) (1977)
 
 
 [4]
 It is undisputed that the Lloyds submitted a letter expressing their intent to resign from their positions with PRS. There is some factual dispute about whether they were terminated by PRS before they could act on this intention. However, this factual dispute has no bearing on the legal discussion below
 
 
 [5]
 The national realty organization, Realty World, Inc., filed suit against PRS in United States District Court for the Eastern District of Virginia. Following the removal of the Alabama case to the federal district court, the two lawsuits were consolidated. All disputes between PRS and Realty World were settled before trial and are not raised in this appeal
 
 
 [6]
 We affirm without need for discussion the district court's holdings that there was insufficient evidence to create questions for the jury on the Lloyds' fraud claim or on PRS' counterclaim for conversion
 
 
 [7]
 The statute reads in relevant part as follows:
 (a) Any person who:
 (1) Sells or offers to sell a security in violation of any provision of this article or of any rule or order imposed under this article or of any condition imposed under this article ...
 is liable to the person buying the security from him who may bring an action to recover the consideration paid for the security, together with interest at 6% per year from the date of payment, court costs and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security.
 
 
 [8]
 The statute was repealed in January, 1980, prior to the initiation of this suit. The district court correctly held that it could be applied to actions occurring during its existence. Our discussion below demonstrates, however, that no statutory violation was shown
 
 
 [9]
 The "insolvency" claim was not originally in the complaint. After PRS responded to a request for admission by admitting that its liabilities were in excess of the book value of its assets, the Lloyds decided to assert Sec. 8-6-20 as a ground supporting its lawsuit. The trial court initially granted a motion in limine against introduction of evidence on insolvency because the Lloyds had not notified PRS in its complaint or pretrial order that the statute would be asserted. The court later reconsidered and allowed testimony on the issue
 
 
 [10]
 A further support for our decision is the Lloyds' knowledge, before purchase, of PRS' poor financial condition. Realty World officials had given the purchasers such information and they had access to the PRS financial records before buying the stock. Thus, the Lloyds, experienced realtors, knew of the financial difficulties that PRS was having. Even if insolvency had been shown and civil liability was a possibility under Sec. 8-6-19, the Lloyds' awareness of the company's financial condition would have barred them from suing to rescind the stock sale. See Ala.Code Sec. 8-6-19(f) (1977) ("no person who has made or engaged in the performance of any contract in violation of any provision of this article or any rule or order hereunder or who has acquired any purported right under any such contract with knowledge of the facts by reason of which its making or performance was in violation, may base any action on the contract.")
 
 
 [11]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209
 
 
 [12]
 The Lloyds also argue that PRS violated federal registration requirements. Because the complaint did not clearly state that cause of action, and because the Lloyds failed to include it in the pretrial order specifying issues to be tried, the district court refused to entertain evidence or argument on that ground. We do not find this decision to be an abuse of the broad discretion accorded the trial judge to control pretrial procedures. National Distillers & Chemical Co. v. Brad's Machine Products, 666 F.2d 492, 497 (11th Cir.1982)
 
 
 [13]
 Fed.R.Evid. 803(6), while setting forth the prerequisites for admission of business records, recognizes that such records should be excluded if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness."
 
 
 [14]
 Fed.R.Evid. 801(d)(2) allows the admission of a statement against a party (in this case, PRS), if it is ... "(c) a statement by a person authorized by [it] to make a statement concerning the subject, or (d) a statement by [its] agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship ...." The Lloyds failed to draw the critical link between Norwood's own statements and his authority, vis a vis PRS, to make them
 
 
 [15]
 The Second Circuit has maintained that the formal notice requirements of Fed.R.Evid. 803(24) and 804(b)(5) must be strictly complied with. See, e.g., United States v. Ruffin, 575 F.2d 346, 358 (2d Cir.1978). While Ruffin has been cited with general approval by our predecessor court, United States v. Atkins, 618 F.2d 366, 372 (5th Cir.1980), there has been no explicit decision of this circuit which specifies how rigidly the notice provisions will be enforced. A leading commentator suggests that rigid application of the notice requirement is at odds with the overriding goals of truth and fairness set out in Fed.R.Evid. 102. See Weinstein's Evidence p 803(24) at 803-294. In affirming the district court's application of the notice requirement in this case, we do not foreclose the possibility that a liberal application may, in other cases, be acceptable under our deferential standard for reviewing district court evidentiary rulings