IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 11, 2001

## STATE OF TENNESSEE v. REGINALD HENDERSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-12801     W. Fred Axley, Judge**

---

**No. W2000-00607-CCA-R3-CD  - Filed August 10, 2001**

---

The defendant was convicted of second degree murder for a shooting which occurred during a birthday outing at a nightclub and was sentenced to confinement for twenty years.  He appealed, raising as issues, that the trial court erred: (1)  in not correctly instructing the jury as to reasonable doubt; (2) in admitting proof of another bad act of the defendant; (3) in not allowing impeachment with prior convictions of a prosecution witness; (4) in allowing proof as to a prior consistent statement; and (5) in requiring the defendant to show his teeth to the jury.  Based upon our review, we affirm the judgment of conviction of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Christine W. Stephens (on appeal) and Howard L. Wagerman (at trial), Memphis, Tennessee, for the appellant, Reginald Henderson.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; William L. Gibbons, District Attorney General; William Bond, Assistant District Attorney General; and Stephen P. Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### BACKGROUND

The defendant, Reginald Henderson, was convicted for the shooting death of Larry Wood, which occurred in the early morning hours of October 19, 1996, at the Ten Plus One Club in Memphis.  In his appeal, he raises the following issues:

> I.   Whether the trial judge correctly instructed the jury as to "reasonable doubt."

II.     Whether it was error to allow the State's witness, Tonja Beverly, to testify that the defendant previously had pulled a gun on her boyfriend.

III.    Whether it was error not to allow the defendant to impeach the State's witness, Brenda Shields, as to her four previous disorderly conduct convictions and one theft of property conviction.

IV.    Whether it was error to allow the State to utilize a prior consistent statement of its witness Eric Harris.

V.     Whether it was error to require that the defendant exhibit his teeth to the jury.

## FACTS

A number of witnesses testified for the State as to the events at the Ten Plus One Club, which culminated in the death of the victim, Larry Wood.

Tonja Beverly testified that she had arrived at the club at about 7 p.m. on October 18, 1996. Later, she was joined by her friend Mildred Shields, who was celebrating her birthday that day, as well as by Brenda Shields, Jemal Duncan, who was Brenda's fiancé, and Jemal's cousin, Larry Wood. She described what occurred, when the defendant, whom she called "Little Reggie," approached the table where her group was sitting:

A.    Little Reggie came and he was standing in front of the door, which is right there by the table we was sitting at. And he said something to Andrea. Andrea was sitting in front of me. What he said to her, I don't know, but I know Larry told Little Reggie, he said, Don't talk to my sister like that.

And they got to arguing and Little Reggie, you know, telling him, You don't know me, and all this. And then Little Reggie, he kinda looked at me and told him, said, You need to tell this motherfucker who I am, you know what I'm saying. Better tell this nigger who I am.

Q.    Now, who said that to you?

A.    Little Reggie. I call him Little Reggie.

-2-

Q. Okay. When you say "Little Reggie", do you know his real – his full name?

A. Reginald Henderson.

Ms. Beverly later testified regarding a prior confrontation with the defendant:

Q. Who did he want you to tell?

A. I guess he wanted me to tell Larry, you know, tell him because that's who he arguing with. And –

Q. Why did he point at you and what did he want you to tell him?

A. I don't know. I know this one incident before all this happened when me and my baby daddy, his name's Lemoyne Ruttley (phonetic), we was at this other club called Shaky. And I don't know what happened but I know when me and my baby daddy was leaving out the club –

MR. WAGERMAN: Judge, I renew my objection from earlier.

THE COURT: All right, sir. The ruling's the same. You may proceed.

BY MR. JONES:

Q. So you say your baby's daddy was Lemoyne?

A. Yeah. His name's Lemoyne. They call him Mon (phonetic). And we was leaving this club called Shaky. And Mon was talking to his friend named Bird and Little Reggie came out. I don't know if Mon and Little Reggie had some words or not, but I know he pulled a gun on my baby daddy. He cocked it, you know what I'm saying, he told me the same thing he told me that night he told Larry, you know what I'm saying, I better get this mother fucker away from down here. Reggie's talking about my baby daddy.

Q. Okay. When you say he pulled the gun on your baby's daddy, who's the "he" you're talking about?

A.   Little Reggie, Reginald Henderson, he pulled a gun on my baby father.

Q.   And is that what was going through your mind when he pointed at you and said, You better tell him who I am?

A.   Yes, that's what I believed because, I mean, I know him far as like being at the club but, you know, I ain't never just kicked with him, you know, but that's the only thing that I could indicate, that he was telling me I better tell this nigger, you know what I'm saying, who I am.

As the victim and the defendant began fighting, and were joined by others, Ms. Beverly left the immediate area and went to the back of the club. She heard three shots and returned to the area of the club where she had been before and saw the victim lying on the floor.

Beverly Mason testified that she had gone to the club with the victim to help Mildred Shields celebrate her birthday. She was at the bar, watching three men at the pool table, when she heard three shots. She did not see with whom the victim was fighting, nor did she see anyone with a gun.

Mildred Shields testified that she had been at the Ten Plus One Club on October 19, 1996, celebrating her birthday. Larry Wood and another man began arguing, both using profanities, and she went to another part of the club to avoid the argument. She heard shots and saw the victim on the floor. However, she did not see who had shot him.

Brenda Shields, the sister of Mildred Shields, observed the argument and described what happened after the victim had objected to the defendant's treatment of one of the female patrons at the club:

Little Reggie. Little Reggie replied to Larry, Who the fuck you think you talking to? You don't know nothing about me. And then Larry said, Man, I'm just saying, man, you know you ain't got to be disrespecting the lady like that, you know. And Little Reggie like, You don't tell me what mother fucking thing to do, you don't tell me a goddamn thing. And I told Larry, I said, Larry, I said, just leave it alone, you know. We just, you know, we enjoying the party. So Larry reached out and asked Little Reggie, you know, to shake his hand. And Little Reggie, I'm not shaking your mother fucking hand, I'm not shaking your mother fucking hand. Man, you got me fucked up. And he turned back around to Tonja Beverly, which was another lady, she was at the club also. When we got there, we was sitting at the same table together.

She then told of the fight between the victim, the defendant, and their friends, and the ensuing shooting of the victim by the defendant:

> He was – it was Jemal, Larry, and Tony Saulsberry on the side of the wall, which is the wall – from where I'm standing it's like right here. You know, only thing in between that wall is the hallway. So they wasn't that way. They was right here and I was right here. And they was on the side of the wall right here fighting.
>
> And where Little Reggie came from, I do not know, from when he got up off that ground. Because they was over there on Tony and my attention was focused over there where my fiancee was in it with Tony and them. And Little Reggie came behind Larry and shot him. Then the club got black. And that's when I hid under the table. And where Little Reggie went and everybody else went, I don't know. But when them lights came on, Little Reggie – I saw Little Reggie came right up behind Larry and pulled the gun, boom, boom, shot him two more times in his back, and Larry just fell completely down on the ground.

Jemal Duncan, who was involved in the fight, also testified that he saw the defendant shoot the victim three times:

> Well, me and my cousin had put some tables together, and the women had came in, they sat down at the table. And me and my girlfriend start dancing. And then after a while a song went off, she was headed onto the dance floor. I stayed on the dance floor talking to another guy that was in the club. I don't just know his name.
>
> And then I see a struckus (sic) had broke out. And then when my girlfriend came over there and she told me it was my cousin. So I ran over there and there was a guy on my cousin's back. So I grabbed that guy and threw him off of my cousin's back and he hollered at the guy and told him, Little Reggie, we'll be back. And he went in the other room.
>
> And all of – it was a whole lot of guys came running in the room. So I jumped up in the hallway and start, you know, getting them guys back. Everybody was trying to come in there and jump us then. And while my cousin was whipping the guy named Reggie that was on the ground who he had the fight with, another guy had jumped on his back. And my cousin jumped up and started fighting that guy and had

him up against the wall, and that's when the guy that was on the ground named Reginald jumped up and shot him in the back.

And my cousin was falling to the ground and as he was falling towards me and the lights had went out for some reason. And he was – my cousin was falling down to the ground, he was falling towards me. And Reginald had ran up on him again and shot him two more times while he was on the ground. And by that time I was running behind the bar trying to get out the way.

After the State had rested its case, the defense rested without presenting proof.

## ANALYSIS

### I. Reasonable Doubt Instruction

As to "reasonable doubt," the trial court utilized T.P.I.-Crim. 2.03(a) which provides as follows:

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.

It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.

A reasonable doubt is just that–a doubt that is reasonable after an examination of all the facts of this case.

If you find the state has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

The defendant argues that this instruction is deficient because it does not include the phrase "moral certainty," as does T.P.I.-Crim. 2.03. The comment to the latter section explains why, at the time of the 1995 printing of the fourth edition of the Tennessee Pattern Jury Instructions, there were alternative instructions as to "reasonable doubt:"

The Committee is of the opinion that the use of the term "moral certainty" in the jury charge on reasonable doubt may be reversible error under *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). Therefore, the Committee has written an

-6-

alternative instruction, T.P.I.–CRIM. 2.03(a), Reasonable Doubt. However, as of the time of publication of this edition, the Court of Criminal Appeals had approved the use of the term "moral certainty" in this instruction. *State v. Hallock*, 875 S.W.2d 285 (Tenn. Crim. App. 1993), *appeal denied* (Feb. 28, 1994).

T.P.I.-Crim. 2.03 Cmts. 2.

In State v. Ronald D. Correll, No. 03C01-9809-CC-00318, 1999 WL 812454, at *8 (Tenn. Crim. App. Oct. 8, 1999), perm. to appeal denied (Tenn. Apr. 24, 2000), this court reviewed the cases in which T.P.I.-Crim. 2.03(a) had been upheld:

> This court has held that T.P.I. Crim. No. 2.03(a) is consistent with principles of due process. *State v. Saulsberry*, No. 02C01-9710-CR-00406, 1998 WL 892281, at *13-14 (Tenn. Crim. App. at Jackson, December 21, 1998); *State v. White*, No. 02C01-9710-CR-00384, 1998 WL 376352, at *1 (Tenn. Crim. App. at Jackson), *perm. to appeal denied*, ( Tenn. 1998); *State v. Henning*, No. 02C01-9703-CC-00126, 1997 WL 661455, at *9 (Tenn. Crim. App. at Jackson, October 24, 1997).

In State v. Melvin Edward Henning, No. 02C01-9703-CC-00126, 1997 WL 661455, at *9 (Tenn. Crim. App. Oct. 24, 1997) (footnote omitted), we rejected a challenge that 2.03(a) was deficient because it did not contain the phrase "to a moral certainty":

> Tennessee Pattern Instruction 2.03(a) tracks virtually identical language of pattern reasonable doubt instructions approved by a majority of the federal circuits. *See, e.g.*, *United States v. Velasquez*, 980 F.2d 1275, 1278 (9th Cir.1992), *cert. denied*, 508 U.S. 979, 113 S. Ct. 2979 (1993); *United States v. Campbell*, 874 F.2d 838, 841 (1st Cir. 1989); *United States v. Hall*, 854 F.2d 1036, 1039 (7th Cir. 1988); *United States v. Kirby*, 838 F.2d 189, 191-192 (6th Cir. 1988); *United States v. Colon*, 835 F.2d 27, 31-32 (2nd Cir. 1987), *cert. denied*, 485 U.S. 980, 108 S. Ct. 1279, 99 L. Ed. 2d 490 (1988); *United States v. Dilg*, 700 F.2d 620 (11th Cir. 1983); *United States v. Alonzo*, 681 F.2d 997, 1002 (5th Cir.), *cert. denied*, 459 U.S. 1021, 103 S. Ct. 386, 74 L. Ed. 2d 517 (1982); *United States v. Robertson*, 588 F.2d 575, 579 (8th Cir. 1978), *cert. denied*, 441 U.S. 945, 99 S. Ct. 2166, 60 L. Ed. 2d 1048 (1979). Moreover, the questioned language "based upon reason and common sense" and "absolute certainty is not required" has repeatedly been upheld as passing constitutional muster. *See, e.g., United States v. Kime*, 99 F.3d 870 (8th Cir. 1996), *cert. denied*, --- U.S. ---, 117 S. Ct. 1015 (1997);

*United States v. Miller*, 84 F.3d 1244 (10th Cir.), *cert. denied*, --- U.S. ---, 117 S. Ct. 443 (1996) *overruled on other grounds by United States v. Holland*, 116 F.3d 1353 (10th Cir. 1997); *United States v. Campbell*, 61 F.3d 976, 980-981 (1st Cir. 1995), *cert. denied*, --- U.S. ----, 116 S. Ct. 1556 (1996); *Hall*, 854 F.2d at 1038-1039; *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993).

We do not find that the instruction taken separately renders the reasonable doubt instruction constitutionally deficient. Additionally, considering this language in the context of the full charge, we find no reasonable likelihood that the jury understood the instruction to permit conviction after anything but a process of careful deliberation or upon less than proof beyond a reasonable doubt. This issue is without merit.

We conclude that the reasonable doubt instruction was adequate.

## II. Testimony As To Prior Bad Act of the Defendant

Prior to the trial, the State advised the court and defense counsel that Tonja Beverly would testify that previously the defendant had pulled a pistol on her boyfriend:

> MR. JONES: And what we expect Ms. Beverly to testify to is the fact that the defendant told her, told our witness, You better tell him, the victim, who I am. And she used – he used some expletives.
>
> And the purpose of introducing that statement – and I'm going to ask the witness what she – what that meant – and the fact that the defendant was asking her, because the defendant knew that the witness had seen the defendant pull a gun on a boyfriend of the witness, the father of –
>
> THE COURT: Okay. Her boyfriend. Yeah.
>
> MR. JONES: She saw the defendant pull a gun on her boyfriend at the time and the defendant telling her, You better tell the victim who I am – I'm paraphrasing – that is relevant to the defendant's state of mind. It's a non-character issue. It's relevant to the state of mind of the defendant, which is at issue here. It goes to his intent, the mens rea requirement for the charged offense, and the probative value of that does substantially outweigh any prejudicial value of the prior bad act that we're seeking the witness to testify to.

So the fact that he made this statement of, you better tell the victim who I am, is relevant to the defendant's state of mind at the time in very close proximity to the actual murder.

Based upon this representation, the trial court concluded that the testimony was admissible:

And I'm sitting here thinking, it's either a knowing killing or a killing produced by adequate provocation sufficient to – That's what the jury is going to be looking at, a material element of the accusation.

. . . .

Well, taking the State as an officer of the court that it goes toward state of mind, that's their purpose for this, I'm going to let it in, subject to cross-examination, whatever you want to do with it.

The witness's subsequent testimony as to the prior incident was as follows:

Q. So you say your baby's daddy was Lemoyne?

A. Yeah. His name's Lemoyne. They call him Mon (phonetic). And we was leaving this club called Shaky. And Mon was talking to his friend named Bird and Little Reggie came out. I don't know if Mon and Little Reggie had some words or not, but I know he pulled a gun on my baby daddy. He cocked it, you know what I'm saying, he told me the same thing he told me that night he told Larry, you know what I'm saying, I better get this mother fucker away from down here. Reggie's talking about my baby daddy.

Q. Okay. When you say he pulled the gun on your baby's daddy, who's the "he" you're talking about?

A. Little Reggie, Reginald Henderson, he pulled a gun on my baby father.

Q. And is that what was going through your mind when he pointed at you and said, You better tell him who I am?

A. Yes, that's what I believed because, I mean, I know him far as like being at the club but, you know, I ain't never just kicked with him, you know, but that's the only thing that I could

-9-

indicate, that he was telling me I better tell this nigger, you know what I'm saying, who I am.

The defense asserts that the trial court erred in allowing this testimony as to a prior bad act of the defendant.

In State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), cert. denied, ___ U.S. ___, 121 S. Ct. 1202, 149 L. Ed. 2d 116 (2001), our supreme court explained the elements of second degree murder:

> An example of a result-of-conduct offense is second degree murder, which is defined as a "knowing killing of another." Tenn. Code Ann.§ 39-13-210(a)(1). In second degree murder, the result of the conduct is the sole element of the offense. The "nature of the conduct" that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the state's case in second degree murder. Accordingly, a result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result.

All that was shown by the sketchy description of the defendant's pulling a pistol on the witness's boyfriend, was that, when angered on a prior occasion, the defendant produced a pistol. It is clear that this testimony delves substantially into the proscribed area of propensity evidence, which is not allowed by Tennessee Rule of Evidence 404(b). While it can be argued that this information was necessary because of the defendant's instruction that the victim be told "who" the defendant was, such an explanation simply is too speculative to allow testimony that at some time in the past, the defendant appeared to be angered easily and produced a pistol. This testimony was not relevant to an element of the charged offense. Thus, we conclude that it was error to allow the testimony.

We must next determine whether the error more probably than not affected the judgment. See Tenn. R. Crim. P. 52(a). Because the issue here is primarily an evidentiary one, the effect of a ruling in violation of Tennessee Rule of Evidence 404(b) is weighed by the same standard as other nonconstitutional evidentiary errors: The defendant must show that the error probably affected the judgment before reversal is appropriate. See State v. Moore, 6 S.W.3d 235, 242 (Tenn.1999) (stating that severance of offenses is primarily an evidentiary question and, as such, error must be shown to have probably affected the judgment) (citing State v. Burchfield, 664 S.W.2d 284, 286 (Tenn. 1984)).

In view of the testimony of multiple witnesses as to the defendant's violently aggressive behavior and of two witnesses that he shot the victim three times in the back, we cannot conclude that this testimony of a prior bad act affected the verdict in the instant case.

### III. Not Allowing Impeachment as to Prior Disorderly Conduct and Theft Convictions of State's Witness

The trial of this matter occurred in 2000. In 1986, the State's witness, Brenda Shields, had been convicted four times of shoplifting and one time for theft. The trial court refused to allow the defense to impeach the witness through use of these convictions, and this had been assigned as error.

Initially, the trial court took under advisement the defendant's request that he be allowed to impeach Shields with these convictions, stating that "[i]f in the course of direct examination she says something that could open the door to your pursing it, I would allow you to do it then." Following the testimony of this witness, the trial court stated, "I've heard nothing either on direct or cross that would cause this Court to let you ask that question." The defense argues that all of the convictions involved dishonesty and, thus, were relevant as to the credibility of the witness.

Regarding impeachment by evidence of a prior conviction, Tennessee Rule of Evidence 609(b) provides:

> Time Limit. – Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

These convictions occurred approximately fourteen years prior to the trial in this matter. In determining whether the trial court erred in not allowing impeachment by these convictions, we will apply the abuse of discretion standard, as explained in State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997) (footnotes omitted):

> The standard of review where the decision of the trial judge is based on the relevance of the proffered evidence under Rules 401 and 402 is abuse of discretion. Neil P. Cohen et al., *Tennessee Law of Evidence* § 401.5 at 86-87 (3d ed. 1995); *Dockery v. Board of*

*Professional Responsibility*, 937 S.W.2d 863, 866 (Tenn. 1996); *cf.*
*State v. Porterfield*, 746 S.W.2d 441, 450 (Tenn.), *cert. denied*, 486
U.S. 1017, 108 S. Ct. 1756, 100 L. Ed. 2d 218 (1988).

Implicit in the ruling of the trial court was its belief that the probative value of these convictions were outweighed by the prejudice which would result from their use. In view of the nature of and substantial passage of time since the convictions, as well as the nature of the testimony of the witness to be impeached in relation to the other evidence presented by the State, we cannot conclude that the trial court abused its discretion in not allowing impeachment by use of these prior convictions.

This assignment is without merit.

### Issue IV. Reference to Prior Statement of Prosecution Witness

The defendant argues that the prosecution, in asking its witness Eric Harris if he had told the police, as he had just testified, that the defendant came to his house following the robbery, improperly bolstered its witness by utilizing a prior consistent statement. The State disagrees with this characterization, stating that the witness was merely asked if he had made a statement to the police telling them of the defendant's visit to the house.

Harris testified on direct examination that he had been at the Ten Plus One Club the night of the shooting and had seen the defendant fighting with another man, whom he believed to the victim. As others crowded around, he heard a shot but did not see who fired it. As he ran out the door, he heard two more shots. While waiting in the parking lot for his companions, he saw the defendant, who appeared to be mad, leave the club. He did not see anything in the defendant's hand. About an hour later, while Harris was at the house of his companions, the defendant came by and said that a "dude hit him in his head so he took care of that." Shortly thereafter, the defendant left, and the police arrived sometime later, arresting Harris and his companions. The series of questions and responses which prompted the bolstering the witness objection occurred when Harris told of his being questioned while in police custody:

> Q. During that time did the police talk to you and they take your statement about the incident?
>
> A. Yes, sir.
>
> Q. And did you tell them about Reggie coming by the house?
>
> MR. WAGERMAN: Judge, I object. I submit a prior. . . . .

The trial court concluded that Harris's statement that he had told the police of the defendant's visit and statement was not the same as his relating the contents of a prior consistent statement and overruled the defense objection. Harris then testified:

> Q. Mr. Harris, did you report to the police about Mr. Henderson coming by the house?
>
> A. At what time?
>
> Q. When they took your statement from you.
>
> A. Yeah, down here. Uh-huh.
>
> Q. And did you tell them the essence of what he said?
>
> A. Yes, sir.
>
> Q. Did they also show you a, what we call a photo lineup? A – it's a copy of six photographs of male blacks and ask you if you could identify anyone?
>
> A. Yes, sir.

We agree with the ruling of the trial court and the State's analysis of the evidentiary flow of this matter. Harris did not relate both what occurred when the defendant came to the house following the shooting and then relate exactly what he had told the police in this regard. Instead, he simply testified that he had told the police, as he had testified in court, of the defendant's visit. His statement that he had told these facts to the police also explained why they then showed him a photographic lineup, which included a photograph of the defendant. The circumstances under which a prior consistent statement can be utilized was explained in State v. Hodge, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998):

> It is true that ordinarily prior consistent statements of a witness are not admissible to bolster the witness' credibility. *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980). However, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Before prior consistent statements may be admissible, the witness' testimony must have been assailed or attacked to the extent that the witness' testimony needs rehabilitating. *Benton*, 759 S.W.2d at 434. In the matter *sub judice*, during cross-examination, the defense repeatedly asked Ms. Mullinex

whether she ever told anyone of the abuse and whether she told all the details she related at trial to the people she told earlier. The testimony of Mr. Townsend and Ms. Hughes was properly admitted to show that Tina Helton Mullinex did tell about the abuse.

As noted in Neil P. Cohen et al., Tennessee Law of Evidence, § 801.8, at 499, (4th ed. 2000), a prior consistent statement is not hearsay, for it is admitted to rehabilitate the witness, not "to prove the truth of the matter asserted in the statement." Here, however, the witness was questioned only as to whether such a statement had been made, not its contents. While the relevance is questionable of the fact that an as yet unassailed witness made a prior statement consistent with the witness's trial testimony, see Tenn. R. Evid. 402, the admissibility of evidence is a matter within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). We cannot conclude that the trial court abused its discretion in this regard.

Thus, we conclude that in affirming that he had made a consistent statement to investigating officers, who then showed the witness a photograph of the defendant, the witness was not allowed to improperly bolster his testimony, as might have occurred if the contents of the prior statement had been related to the jury.

This assignment is without merit.

### Issue V. Defendant's Displaying His Teeth to the Jury

During the direct examination of prosecution witness Tonja Beverly, after she had described the clothing that the defendant was wearing the night of the shooting, she gave an affirmative response when asked whether the defendant had gold teeth. Later, the State asked that the defendant stand and display his teeth to the jury, which prompted an objection by defense counsel. The trial court, ruling that such a display would be nontestimonial in nature, ordered that the defendant stand and display his teeth. The defendant has assigned this action as error, arguing that the act was testimonial in nature. We disagree.

The circumscriptions of the privilege against self-incrimination, preventing a defendant from being required to perform testimonial acts, do not permit the refusal of a defendant to perform any act simply because it aids the prosecution, as was explained in Schmerber v. California, 384 U.S. 757, 763-64, 86 S. Ct. 1826, 1832, 16 L. Ed. 2d 908, 916 (1966) (citation and footnote omitted):

> It is clear that the protection of the privilege [against self-incrimination] reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. On the other hand, both federal and state courts have usually held that it offers no protection against

-14-

compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.

That the trial court has discretion to allow a jury to "view certain aspects of an individual's physical appearance, such as tattoo or scars" is recognized in 3 Wharton's Criminal Evidence § 16:20 (15th ed. 1999). Tennessee courts recognize this principle, as explained in State v. Henderson, 623 S.W.2d 638, 641 (Tenn. Crim. App. 1981):

The only other matter raised on appeal concerns the defendant's insistence that the ruling of the trial judge which forced him to display to the jury a distinctive tattoo on his arm violated his Fifth Amendment right against self-incrimination. The defendant cites no authority to support this proposition, and we conclude that the law is to the contrary. *See, e.g., Black v. State*, 479 S.W.2d 656, 658 (Tenn. Crim. App. 1972). We thus find no error in connection with this issue.

In support of his argument that it was improper for the trial court to order that he exhibit his teeth to the jury, the defendant relies upon State v. Coury, 697 S.W.2d 373, 378 (Tenn. Crim. App. 1985), wherein this court stated that requiring a defendant to exhibit his tattoo would be a testimonial act. The accuracy of this analysis was questioned by State v. Rodriguez, 752 S.W.2d 108, 111 (Tenn. Crim. App. 1988), which noted both that the statement regarding the tattoo was dicta and contrary to the previous holding of this court in Henderson. We, likewise, decline to follow this holding in Coury.

Given the testimony of Tonja Beverly, it is clear that the trial court was correct in ordering the defendant to display his teeth to the jury, for the act was nontestimonial. This assignment is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE